**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-01903

**BAYAUD ENTERPRISES, INC.**

and

**SOURCEAMERICA**

Plaintiffs,

v.

**U.S. DEPARTMENT OF VETERANS AFFAIRS**

and

**ROBERT WILKIE, IN HIS OFFICIAL CAPACITY AS SECRETARY OF VETERANS AFFAIRS**

and

**UNITED STATES OF AMERICA**

Defendants.

---

**PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF**

---

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    RELEVANT PROCEDURAL BACKGROUND ............................................... 2

III.   FACTUAL AND LEGAL BACKGROUND ...................................................... 3

       A.     Javits-Wagner-O'Day Act. ....................................................................... 3

       B.     SourceAmerica ........................................................................................... 4

       C.     Bayaud ....................................................................................................... 5

       D.     The VBA .................................................................................................... 5

       E.     The VA's Longstanding Position Regarding the Interplay Between the
              JWOD Act and The Rule of Two. ............................................................ 6

       F.     The Court of Federal Claims Decision in *PDS Consultants, Inc. v. United
              States* ........................................................................................................ 7

       G.     The *PDS* Appeal ...................................................................................... 8

       H.     The May 20, 2019 Class Deviation .......................................................... 9

IV.    STATUTORY JURISDICTION, STANDING, AND RIPENESS ................... 9

       A.     Statutory Jurisdiction ............................................................................... 9

       B.     Plaintiff SourceAmerica Has Both Direct and Organizational Standing. ............. 10

       C.     This Matter Is Ripe for Review. ............................................................. 10

V.     LEGAL STANDARD ........................................................................................ 11

VI.    ARGUMENT ...................................................................................................... 12

       A.     Plaintiffs Will Suffer Irreparable Harm. ................................................ 12

       B.     Plaintiffs Have A Substantial Likelihood of Prevailing on The Merits. ............... 19

              1.     The 2019 Class Deviation is Arbitrary, Capricious, and Contrary to
                     Law. ............................................................................................... 19

                     a.     The Text Does Not Expressly or Implicitly Support that the
                            VBA Repeals the JWOD Act .............................................. 20

b.    The Congressional History and Procurement Landscape in Which the VBA Was Enacted Further Support Plaintiffs' Interpretation. ................................................................................ 26

c.    The VA and Others Have Long Harmonized the Statutes. ............ 30

d.    The Federal Circuit's Decision in the *PDS* Case Is Wrong .......... 31

2.    The VA Violated the APA's Notice-and-Comment Procedures. .............. 34

3.    The VA's Failure to Require its Contractors to Purchase Goods and Services from the Procurement List Is Contrary to Law. ........................ 36

C.    An Injunction Will Not Harm the VA. .................................................... 37

D.    Injunctive Relief Will Further the Public Interest. .................................................. 38

E.    Injunctive Relief Should Extend Nationwide. ...................................................... 39

VII.    PRAYER FOR RELIEF ...................................................................... 40

# TABLE OF AUTHORITIES

<span style="font-variant: small-caps;">CASES</span>                                                                                      Page(s)

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ...................................................................13

*Associated Builders & Contractors of Se. Tex. v. Rung*,
   No. 1:16-cv-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016)...........................12, 37, 38, 39

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor*,
   713 F.3d 1080 (11th Cir. 2013) ...........................................................12, 39

*Diné Citizens Against Ruining Our Env't v. Jewell*,
   839 F.3d 1276 (10th Cir. 2016) ...................................................................11

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
   356 F.3d 1256 (10th Cir. 2004) ...................................................................13

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*,
   630 F.3d 1153 (9th Cir. 2011) ...................................................................13

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018).........................................................................24, 32

*Fire-Trol Holdings LLC v. U.S. Forest Service*,
   209 Fed.Appx. 625 (9th Cir. 2006)...............................................................31

*Gerber Legendary Blades*,
   B-412730, B-412730.2, May 20, 2016, 2016 CPD ¶ 139.........................................31

*Gomez v. United States*,
   490 U.S. 858 (1989).............................................................................37

*Humphrey's Ex'r v. United States*,
   295 U.S. 602 (1935).............................................................................33

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977).............................................................................10

*Int'l Mgmt. Servs., Inc. v. United States*,
   80 Fed. Cl. 1 (2007) ...........................................................................34

*Kingdomware Technologies, Inc. v. United States*,
   __ U.S. __, 136 S.Ct. 1969 (2016)........................................................6, 7, 33

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   568 U.S. 519 (2013).............................................................................33

*Matson Nav. Co. v. United States*,
   284 U.S. 352 (1932), superseded on other grounds by Act of June 25, 1948,
   ch. 646, 62 Stat. 942 (codified at 28 U.S.C. § 1500) ............................................21

*Mich. Dep't of Educ. v. U.S. Dep't of Educ.*,
   875 F.2d 1196 (6th Cir. 1989) .................................................................................9

*Morton v. Mancari*,
   417 U.S. 535 (1974)......................................................................................25, 26

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)................................................................................................34

*Nat'l Ski Areas Ass'n, Inc. v. U.S. Forest Serv.*,
   910 F. Supp. 2d 1269 (D. Colo. 2012)..................................................................34

*New Mexico v. Dep't of Interior*,
   854 F.3d 1207 (10th Cir. 2017) ............................................................................11

*PDS Consultants, Inc. v. United States*,
   132 Fed. Cl. 117 (2017) .....................................................................................3, 7

*PDS Consultants, Inc. v. United States*,
   907 F.3d 1345 (Fed. Cir. 2018).............................................................................9

*RoDa Drilling Co. v. Siegal*,
   552 F.3d 1203 (10th Cir. 2009) ............................................................................12

*Salt Lake Tribune Publ'g Co., LLC v. AT & T Corp.*,
   320 F.3d 1081 (10th Cir. 2003).............................................................................13

*Schein v. Archer & White Sales, Inc.*,
   139 S. Ct. 524 (2019).............................................................................................21

*Sebelius v. Cloer*,
   569 U.S. 369 (2013)...............................................................................................20

*Southfork Sys., Inc. v. United States*,
   141 F.3d 1124 (Fed. Cir. 1998).............................................................................31

*Sumpter v. Sec'y of Labor*,
   763 F.3d 1292 (11th Cir. 2014) ..............................................................................9

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ..................................................................12, 38, 39

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
   60 F.3d 27 (2d. Cir. 1995).....................................................................................17

*United States v. Borden Co.*,
    308 U.S. 188 (1939)........................................................................25, 26

*United States v. Colorado*,
    990 F.2d 1565 (10th Cir. 1993) ..........................................................26

*Watts v. Karmichael Family, LLC*,
    No. 07-cv-00638, 2007 WL 1059051 (D. Colo. Apr. 4, 2007) ..............11

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)............................................................................26

**STATUTES**

5 U.S.C. §§ 551–706.............................................................................2, 34

5 U.S.C. §§ 701–706......................................................................9, 16, 20

18 U.S.C. Chapter 307 ..............................................................................21

18 U.S.C. § 4124 .......................................................................................21

28 U.S.C. §§ 2201–2202.....................................................................9, 10, 16

38 U.S.C. § 8127 ............................................................................... *passim*

38 U.S.C. § 8128(a) ...................................................................................24

41 U.S.C. Chapter 85 ...............................................................................2, 3

41 U.S.C. § 3301........................................................................................6

41 U.S.C. §§ 8501–8506......................................................................... *passim*

48 U.S.C. Subpart 1.4 ...............................................................................34

Unif. Statute & Rule Construction Act § 19 (1995) ...................................21

**REGULATIONS**

13 C.F.R. 121.105(a)............................................................................19, 23

41 C.F.R. Chapter 51 ...........................................................................3, 4, 10

41 C.F.R. § 51-1.1(a) .................................................................................3

41 C.F.R. Part 51-3 .............................................................................4, 10

41 C.F.R. § 51-5.1(a) .................................................................................3

41 C.F.R. § 51-6.15 ..................................................................................................4, 10

48 C.F.R. § 8.000 ..........................................................................................................28

48 C.F.R. § 8.002 ....................................................................................................*passim*

48 C.F.R. § 8.004 ..........................................................................................28, 29, 32

48 C.F.R. Subpart 8.7 ...............................................................................................4, 35

48 C.F.R. § 8.704 ....................................................................................................29, 32

48 C.F.R. § 19.502-1(b) ..............................................................................................29

48 C.F.R. § 808.002 .............................................................................................*passim*

48 C.F.R. § 808.6 ............................................................................................................2

48 C.F.R. § 819.70 ........................................................................................................23

152 Cong. Rec. H9014 ..................................................................................................27

74 Fed. Reg. 64,619 (Dec. 8, 2009) ..........................................................................6, 35

81 Fed. Reg. 51863-02, 2016 WL 4138446 (Aug. 5, 2016) .........................................31

H.R. Rep. No. 109-592 (2006)......................................................................................28

## RULES

Federal Rule of Civil Procedure 65 ............................................................................1, 2

Local Civil Rule 7.1 .......................................................................................................1

Local Civil Rule 65.1 .....................................................................................................1

## GLOSSARY OF RELEVANT ABBREVIATIONS

**ADA**      **Americans with Disabilities Act**

The Americans with Disabilities Act (ADA) "prohibits discrimination against people with disabilities in several areas, including employment, transportation, public accommodations, communications and access to state and local government[] programs and services."[1]

**APA**      **Administrative Procedure Act**

The Administrative Procedure Act governs the rule-making and decision-making processes of administrative agencies of the federal Government and vests federal courts with oversight over agency action.[2]

**CICA**      **Competition in Contracting Act**

The Competition in Contracting Act (CICA), codified at 41 U.S.C. § 3301, requires that the federal Government employ "full and open competition" in competitive procurements.[3]

**CNA**      **Central nonprofit agency**

A central nonprofit agency (CNA) is an agency designated by the AbilityOne Commission under federal law "[t]o represent nonprofit agencies employing persons with [significant] disabilities."[4]   SourceAmerica is a central nonprofit agency.

**COFC**      **Court of Federal Claims**

The Court of Federal Claims is a federal court "authorized to hear primarily money claims founded upon the Constitution, federal statutes, executive regulations, and contracts (express or implied in fact) with the United States.  The court's primary jurisdiction lies in 28 U.S.C. § 1491, known as the Tucker Act."[5]

---

[1] Americans with Disabilities Act, U.S. Department of Labor, https://www.dol.gov/general/topic/disability/ada (last visited June 5, 2019).

[2] *See* 5 U.S.C. §§ 551-706.

[3] *See* 41 U.S.C. § 3301.

[4] 41 C.F.R. § 51-3.1; *see also* 41 U.S.C. § 8503(c) (2017).

[5] Frequently Asked Questions, U.S. Court of Federal Claims, https://www.uscfc.uscourts.gov/faqs (last visited June 5, 2019).

| CRP | **Community rehabilitation program (also "nonprofit agency" (NPA))** |

A <u>community rehabilitation program (CRP)</u> is "a program that provides directly or facilitates the provision of [certain] vocational rehabilitation services to individuals with disabilities to enable those individuals to maximize their opportunities for employment, including career advancement."[6] CRPs receive funding through U.S. Department of Education grants to the States.[7]   The term CRP is used interchangeably with the term "nonprofit agency" (NPA),[8] which describes a contracting agency designated in the AbilityOne Commission's Procurement List as a mandatory source from which the government "shall procure" a particular product or service.[9]

| FAR | **Federal Acquisition Regulation** |

The <u>Federal Acquisition Regulation (FAR)</u>, codified at title 48 of the Code of Federal Regulations, is the set of regulations promulgated by the Federal Acquisition Regulatory Council that establishes the "policies and procedures for acquisition by all executive agencies."[10]   The FAR includes agency-specific procurement regulations, such as the Veterans Affairs Acquisition Regulation (VAAR).

| FSS | **Federal Supply Schedule (also "GSA Schedule")** |

<u>Federal Supply Schedules (FSSs)</u> are "long-term governmentwide contracts with commercial companies that provide access to millions of commercial products and services at fair and reasonable prices to the government."[11]   Federal supply schedules "allow[] agencies to use streamlined ordering procedures to purchase" goods and services.[12]

---

[6] 34 C.F.R. § 361.5(c)(7)(i).

[7] *See* <u>Programs: Vocational Rehabilitation State Grants</u>, U.S. Department of Education, <u>https://www2.ed.gov/programs/rsabvrs/index.html</u> (last visited June 4, 2019).

[8] *See* <u>Glossary</u>, SourceAmerica, <u>https://www.sourceamerica.org/glossary/N</u> (last visited June 4, 2019).

[9] 41 U.S.C. § 8504(a); *see also* 41 C.F.R. Chapter 51; 48 C.F.R. Subpart 8.7; 48 C.F.R. § 808.002.

[10] *See* 48 C.F.R. § 1.101.

[11] *See* <u>About GSA Schedules</u>, U.S. General Services Administration, <u>https://www.gsa.gov/buying-selling/purchasing-programs/gsa-schedules/about-gsa-schedules</u> (last visited June 4, 2019).

[12] *See* <u>Selling to the Government</u>, U.S. General Services Administration, <u>https://www.gsa.gov/buying-selling/purchasing-programs/gsa-schedules/selling-to-the-government</u> (last visited June 4, 2019).

**GAO**          **U.S. Government Accountability Office**

The U.S. Government Accountability Office (GAO) is a legislative agency of the federal Government that "examines how taxpayer dollars are spent and provides Congress and federal agencies with objective, reliable information to help the government save money and work more efficiently."[13]

**GSA**          **U.S. General Services Administration**

The U.S. General Services Administration (GSA) is an independent federal agency that "provides centralized procurement for the federal government."[14]

**JWOD**         **Javits-Wagner-O'Day Act**

The Javits-Wagner-O'Day Act (JWOD Act), codified at 41 U.S.C. Chapter 85, requires that the government prioritize suppliers of products and services who employ individuals who are blind or individuals with significant disabilities.[15]

**NCO**          **Network Contracting Office**

Network Contracting Offices (NCOs) are subdivisions of the U.S. Department of Veterans Affairs' Regional Procurement Offices (RPOs).  Network Contracting Offices work with nonprofit agencies to provide procurement support.  Each numbered Network Contracting Office is coextensive with a Veterans Integrated Service Network (VISN) of the same number.  Whereas nonprofit agencies work with the NCO on the vendor end, the patient interacts with the VISN on the consumer end.[16]

---

[13] *See* About GAO: Overview, U.S. Government Accountability Office, https://www.gao.gov/about/ (last visited June 4, 2019).

[14] *See* Background and History, U.S. Government Accountability Office, https://www.gsa.gov/about-us/background-and-history (last visited June 4, 2019).

[15] *See* 41 U.S.C. Chapter 85.

[16] *See* VHA Procurement & Logistics Office: Regional Procurement Offices, U.S. Department of Veterans Affairs, https://www.va.gov/plo/about/saos.asp (last visited June 4, 2019).

**NPA**          **Nonprofit agency (also "community rehabilitation program" (CRP))**

A nonprofit agency (NPA) is a contracting agency designated in the AbilityOne Commission's Procurement List as a mandatory source from which the government "shall procure" a particular product or service.[17]   The term NPA is used interchangeably with the term "community rehabilitation program" (CRP).[18]

**ODLH**          **Overall direct labor hours**

Overall direct labor hours (ODLH) is a measurement of the number of labor hours, excluding indirect labor hours of support staff, on an AbilityOne contract. The U.S. AbilityOne Commission requires that a nonprofit agency (NPA) fill at least 75 percent of its overall direct labor hours for the fiscal year with employees who are significantly disabled.[19]

**SDVOSB**          **Service-disabled veteran-owned small business**

A service-disabled veteran-owned small business (SDVOSB) is a small business that qualifies as service-disabled veteran-owned under 13 C.F.R. §§ 125.12 and 125.13.

**VA**          **U.S. Department of Veterans Affairs**

The U.S. Department of Veterans Affairs (VA) is an executive agency of the federal Government that provides assistance to veterans, including benefits and healthcare.[20]

**VAAR**          **Veterans Administration Acquisition Regulation**

The Veterans Affairs Acquisition Regulation (VAAR), codified at 48 C.F.R. Chapter 8, is a section of the Federal Acquisition Regulation (FAR) that contains procurement regulations specific to the U.S. Department of Veterans Affairs (VA).

---

[17] 1 U.S.C. § 8504(a); *see also* 41 C.F.R. Chapter 51; 48 C.F.R. Subpart 8.7; 48 C.F.R. § 808.002.

[18] *See* Glossary, SourceAmerica, https://www.sourceamerica.org/glossary/N (last visited June 4, 2019).

[19] *See* Policy 51.401: Direct Labor Ratio Requirements, U.S. AbilityOne Commission, 2, https://www.abilityone.gov/laws,_regulations_and_policy/documents/Policy%2051%20401%20 a.pdf (last accessed June 5, 2019).

[20] *See* About VA, U.S. Department of Veterans Affairs, https://www.va.gov/about_va/va history.asp (last visited June 4, 2019).

**VBA**        **Veterans Benefits Act of 2006**

The Veterans Benefits, Health Care, and Information Technology Act of 2006 (VBA) "repeal[ed] certain limitations on attorney representation of claimants for benefits under laws administered by the Secretary of Veterans Affairs, . . . expand[ed] eligibility for the Survivors' and Dependents' Educational Assistance Program, . . . otherwise improve[d] veterans' benefits, memorial affairs, and health-care programs, [and] enhance[d] information security programs of the Department of Veterans Affairs," among other things.[21]

**VISN**        **Veterans Integrated Service Network**

Veterans Integrated Service Networks (VISNs) are the patient-facing counterparts to the U.S Department of Veterans Affairs' Network Contracting Offices (NCOs). Whereas the NCO in a particular area works with nonprofit agencies (NPAs) in that area, a VISN interacts with patients in the that area.

**VOSB**        **Veteran-owned small business**

A veteran-owned small business (VOSB) is a small business that qualifies as veteran-owned under 13 C.F.R. § 125.11.

---

[21] Veterans Benefits, Health Care, and Information Technology Act, S. 3421, 109th Cong. (2006).

Plaintiffs Bayaud Enterprises, Inc. and SourceAmerica move for an emergency temporary restraining order and preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65 against the U.S. Department of Veterans Affairs (the "VA"), Robert Wilkie, in his official capacity as Secretary of Veterans Affairs, and the United States of America.

## CERTIFICATION OF LOCAL CIVIL RULE 7.1

Counsel for Plaintiffs conferred with counsel for Defendants regarding this Motion and provided Defendants with notice of this Motion on June 5, June 6, and June 7, 2019.  Defendants oppose the relief requested and oppose expedited relief.  Defendants proposed that the parties agree on a briefing schedule for preliminary relief to coincide with a possible motion to dismiss or motion to transfer, but such a schedule is untenable due to the threat of immediate, irreparable harm.

## CERTIFICATION OF LOCAL CIVIL RULE 65.1

Counsel for Plaintiffs further certify that they have served a copy of this Motion and all accompanying exhibits by email, and that all prior pleadings and documents in this action have been served on counsel for Defendants via CM/ECF.  This Motion is therefore made with notice.

## I.    INTRODUCTION

The VA has announced its intent, effective immediately, to eliminate the statutory priority in government contract awards given to nonprofit agencies that employ significantly disabled persons—a structure that has been in effect since 1971.  Absent an injunction, 63 nonprofit agency contracts with the VA are at risk and approximately 600 of the United States' most vulnerable workers—significantly disabled workers—will lose their jobs, livelihoods, and sense of independence over the next five months alone.  Some of these contracts have already expired or are set to expire by the end of June, including a Bayaud contract.  The VA has also already stated its intent not to renew various nonprofit agencies' key contracts, including internment flag contracts that expire in July 2019, and to replace the nonprofit agencies on these contracts with

for-profit, veteran-owned businesses.  The harm is already starting to occur, and this Motion therefore cannot be handled in the ordinary course.  The Court should prevent this certain irreparable harm and enjoin the VA's unlawful actions while this litigation is pending.

Specifically, Plaintiffs request the Court enjoin Defendants from implementing or enforcing the May 20, 2019 Memorandum titled "Class Deviation from VAAR 808.002, Priorities for Use of Government Supply Sources and VAAR Subpart 808.6, Acquisition from Federal Prison Industries, Inc." (the "2019 Class Deviation").  The 2019 Class Deviation violates the Javits-Wagner-O'Day Act, 41 U.S.C. Chapter 85, and was promulgated in a procedurally defective manner that violated the notice-and-comment requirements of the Administrative Procedure Act, 5 U.S.C. §§ 551−706, the Office of Federal Procurement Policy Act, and the Federal Acquisition Regulation.  Plaintiffs also request the Court enjoin the VA's policy and/or practice of failing to require veteran-owned small businesses and service-disabled veteran-owned small business to buy applicable goods or services from the Procurement List, which is a further violation of the Administrative Procedure Act.

The standards for Rule 65 injunctive relief are met here.  Plaintiffs will suffer irreparable harm unless an injunction preserving the status quo is issued; Plaintiffs are likely to prevail on the merits; the balance of harms favors the Plaintiffs; and an injunction serves the public interest.  A nationwide injunction is necessary to protect all at-risk nonprofit agencies, the significantly disabled individuals they employ, and SourceAmerica from immediate and irreparable harm.

## II.    RELEVANT PROCEDURAL BACKGROUND

Plaintiffs initiated this action in August 2017 to stop the VA from implementing the March 2017 Class Deviation and other procedures that would have improperly prioritized VA contract awards to veteran-owned small businesses above awards to nonprofit agencies that employ significantly disabled workers.  Defendants requested the Court stay this case pending the Federal

Circuit's decision in *PDS Consultants, Inc. v. United States*, 132 Fed. Cl. 117 (2017), or, alternatively, transfer this case to the District of Columbia. ECF No. 13. The Court stayed the case until the Federal Circuit resolved the *PDS* appeal, stating that because "the March 2017 Class Deviation ha[d] been suspended pending resolution of the *PDS* case, the status quo that existed prior to the filing of this action has been temporarily re[sto]red." ECF No. 29.

On May 14, 2019, Defendants notified the Court that the Federal Circuit had decided the *PDS* appeal, and that "[u]pon issuance of the [Federal Circuit's] mandate, the VA intends to revise its current policy as to the interplay between the VBA and the JWOD [Act] . . . ." ECF No. 32 at 2.[22] On May 20, 2019, the Federal Circuit issued the mandate. *PDS Appeal*, Case No. 17-2379, Doc Nos. 162 and 163. That same day, the VA issued the 2019 Class Deviation at issue here. Ex. A.

## III. FACTUAL AND LEGAL BACKGROUND

### A. Javits-Wagner-O'Day Act.

The JWOD Act, 41 U.S.C. Chapter 85, reflects "the policy of the [federal] Government to increase employment and training opportunities for persons who . . . have [significant] disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who . . . have [significant] disabilities." 41 C.F.R. § 51-1.1(a); *see also id.* § 51-5.1(a).[23] To effectuate this policy, the JWOD Act created a new independent federal agency, the U.S.

---

[22] The statutory scheme and supporting regulations are replete with acronyms. VBA is the Veterans, Benefits, Health Care and Information Technology Act of 2006, and JWOD is the Javits-Wagner-O'Day Act. A glossary of abbreviations referenced in this Motion and the Amended Complaint is provided at the outset of this Motion for the Court's convenience.

[23] At times, 41 U.S.C. Chapter 85 and associated regulations refer to the AbilityOne Commission as the "Committee for Purchase from People Who Are Blind or Severely Disabled." Today, "AbilityOne Commission" is the Commission's preferred and official name. Likewise, the AbilityOne Commission today prefers the term "significantly" disabled over the term "severely" disabled.

AbilityOne Commission, which is required to "maintain and publish in the Federal Register a [P]rocurement [L]ist" of goods and services that can be provided by those with significant disabilities.  41 U.S.C. § 8503(a).  The Procurement List currently includes goods and services ranging from internment flags to medical supplies to mailroom services.  Once the AbilityOne Commission places a good or service on the Procurement List, it becomes a mandatory source for government purchasers, and a contracting agency "shall procure" the item from the Procurement List-designated nonprofit agency.  41 U.S.C. § 8504 (identifying exception *only* for supplies from Federal Prison Industries, Inc.).[24]

### B.    **SourceAmerica**

The JWOD Act directs the AbilityOne Commission to assist nonprofit agencies with participation in the AbilityOne program.  To achieve that goal, the AbilityOne Commission has designated SourceAmerica as a central nonprofit agency "[t]o represent nonprofit agencies employing persons with [significant] disabilities."  Decl. of Vincent Loose, Ex. B ¶ 2 ; 41 C.F.R. § 51-3.1; *see also* 41 U.S.C. § 8503(c) (2017).   In this role, SourceAmerica represents approximately 417 nonprofit agencies that participate in the AbilityOne program, including large national nonprofits such as Goodwill Industries and smaller local nonprofits such as Plaintiff Bayaud.  Decl. of Vincent Loose, Ex. B ¶ 3.  Federal regulations implementing the JWOD Act grant SourceAmerica the authority to address (among other things) "[d]isputes between a nonprofit agency and a contracting activity. . . ."  41 C.F.R. § 51-6.15; *see also* 41 C.F.R. Part 51-3.

---

[24] Implementing regulations reflect this priority.  *See* 41 C.F.R. Chapter 51; 48 C.F.R. Subpart 8.7; 48 C.F.R. § 808.002 (implementing the Procurement List mandate in AbilityOne Commission, Federal Acquisition Regulatory Council, and VA regulations, respectively).

### C. __Bayaud__

Bayaud is a Colorado-incorporated nonprofit agency that employs and supports significantly disabled persons. Decl. of David Henninger, Ex. C ¶ 2. Bayaud's mission is to "create **Hope, Opportunity and Choice,** with work as the means through which people with disabilities and other hurdles to employment can more fully participate in the mainstream of life." *Id.* ¶ 3. Since 1969, Bayaud has "changed the lives of tens of thousands of individuals" with significant disabilities by providing living wages and benefits for full-time employment both within the organization and with collaborating partner agencies, including federal contracting agencies as a U.S. AbilityOne Program nonprofit agency. *See id.* ¶ 4; About Us, Bayaud Enterprises, https://www.bayaudenterprises.org/about (last visited June 6, 2019). Bayaud holds several AbilityOne Procurement List designations that provide employment for 42 significantly disabled persons, including 12 service veterans with significant disabilities, who cannot obtain competitive employment elsewhere. *See* Decl. of David Henninger, Ex. C ¶ 10.

### D. __The VBA__

In 2006, Congress enacted the Veterans, Benefits, Health Care and Information Technology Act of 2006 ("VBA"). Among other things, the VBA requires the VA to create annual contracting goals for veteran-owned small businesses ("VOSBs") and service-disabled veteran-owned small businesses ("SDVOSBs"). 38 U.S.C. § 8127(a)(1). For purposes of meeting these goals when the VA goes into the competitive marketplace, the VBA requires that VA contracting officers "shall award contracts on the basis of competition restricted to small business concerns owned and controlled by veterans . . . if the contracting officer has a reasonable expectation that two or more small business concerns owned and controlled by veterans . . . will submit offers and that the award can be made at a fair and reasonable price that offers best value to the United States." 38 U.S.C. § 8127(d).

This two-competitor benchmark is referred to as the "Rule of Two."  Upon completion of a market study confirming satisfaction of the benchmark, the VA restricts competition to veteran-owned small businesses rather than employing full and open competition under the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301.

> **E.** **The VA's Longstanding Position Regarding the Interplay Between the JWOD Act and The Rule of Two.**

Following the VBA's passage, the VA confirmed that the JWOD Act took precedence over the Rule of Two in contracting decisions.  In the final VA rule implementing the Rule of Two, the VA explained that the Rule of Two did not affect the AbilityOne program: "This rule will not negatively impact AbilityOne and its ability to continue to provide employment to disabled veterans.  This rulemaking does not alter AbilityOne's status in the ordering preference for current or future items on the AbilityOne procurement list."  74 Fed. Reg. 64,619 (Dec. 8, 2009).  It further added, "this rule does not impact items currently on the AbilityOne procurement list or items that may be added to the procurement list in the future."  *Id.*  Months later, the VA reaffirmed the Procurement List's primacy over the Rule of Two: "The Veterans First Contracting Program final rule does not affect AbilityOne's order of priority in relation to the Veterans First Contracting Program.  Therefore, all items currently on the AbilityOne Procurement List as of January 7, 2010, will continue to take priority over the contracting preferences mandated by P.L. 109-461."  (Letter Dated April 28, 2010 (No. IL 001AL-10-06), Compl. Ex. E at 2).

In June 2016, the Supreme Court issued its decision in *Kingdomware Technologies, Inc. v. United States*, __ U.S. __, 136 S.Ct. 1969 (2016), holding that the Rule of Two: (1) continues to apply to VA procurements after the VA has met the VBA's contracting goals for the percentage of contracts awarded to VOSBs; and (2) applies to orders placed under the Federal Supply Schedule ("FSS").  The VA subsequently issued Procurement Policy Memorandum 2016-05 to explain that

*Kingdomware* did <u>not</u> alter the VA's previous analysis of the AbilityOne program.  Consistent with its 2009 final legislative rule (VAAR 808.002) and the 2010 information letter, the VA continued to recognize that the Procurement List, as a mandatory source, maintained priority over the Rule of Two.  (July 25, 2016 Class Deviation, Compl. Ex. F at 23−24 (Attach. 4 at 1−2).)  Although the VA sought to discourage its personnel from affirmatively seeking to add new work to the Procurement List, the 2016-05 Procurement Policy and Memorandum recognized that the Procurement List was a "mandatory" source, compared to the Rule of Two, which applied only to "non-mandatory" competitive contracts.  *Id.*

### F.      The Court of Federal Claims Decision in *PDS Consultants, Inc. v. United States*

In *PDS Consultants, Inc. v. United States*, 132 Fed. Cl. 117, a veteran-owned small business challenged the VA's procurement of various items included on the Procurement List on the basis that, in light of *Kingdomware*, the VA (1) must perform a market survey even for items on the Procurement List and (2) must procure the items from a veteran-owned small business if at least two such businesses would bid on the procurement.  *Id.* at 120.  In other words, PDS argued that the Rule of Two applies to VA procurements of goods and services that are found on the Procurement List.  The VA and National Industries for the Blind, the AbilityOne-appointed central nonprofit agency for blind persons (as an amicus), both argued that the Procurement List continued to take priority over the VBA.  *Id.*

While the case was pending, the VA filed notice with the Court of Federal Claims that it had amended its own regulations "to require contracting officers to apply the VA Rule of Two for any acquisition for supplies or services on the AbilityOne procurement list if the date the supplies or services [were added to the list] is not 'readily available' or if the supplies or services were added to the list after January 7 2010 unless the VA applied the Rule of Two before the procurement list addition was made."  *See PDS Consultants, Inc. v. United States*, COFC No. 1:16-cv-1063, ECF

No. 68.  The VA published this notice and the associated 2017 Class Deviation simultaneously. Ex. B to the Am. Compl.

The Court of Federal Claims granted judgment for PDS on the administrative record, including for particular items added to the Procurement List on or before January 7, 2010.  *See* Ex. C to the Am. Compl.  The court also extended the decision to require application of the VA Rule of Two before the VA can exercise options on preexisting contracts with AbilityOne Program nonprofit agencies.  *See* Ex. D to the Am. Compl.  The VA and the Winston-Salem Industries for the Blind appealed the decision.

Following the Court of Federal Claims' decision, the VA issued revised policy guidance to its contracting personnel requiring them "to first perform a Rule of Two analysis to determine whether a procurement for goods or services should be set-aside for service-disabled, veteran-owned small businesses or veteran-owned small businesses, irrespective of whether a supply or service is on the AbilityOne Procurement List.  If the Rule of Two analysis does not demonstrate that there are two qualified service-disabled, veteran-owned small businesses or veteran-owned small businesses capable of performing the contract, the VA is then required to use the AbilityOne List as a mandatory source."  Ex. G to the Am. Compl.

Plaintiffs Bayaud and SourceAmerica filed this lawsuit to stop the VA from implementing and enforcing the 2017 Class Deviation and the VA's subsequent guidance.  Defendants agreed to stay implementation of the new policy pending the Federal Circuit's decision in the *PDS* case, and as a result, the Court perceived "little harm to the Plaintiffs" in staying this case, and granted Defendants' motion to stay.  ECF No. 29.

G.    **The *PDS* Appeal**

In the *PDS* appeal, the VA, National Industries for the Blind (as an amicus), and Winston-Salem Industries for the Blind argued that the Procurement List had priority over awards to

veteran-owned small businesses under the VBA, and that the latter did not displace the former. *PDS Consultants, Inc. v. United States*, 907 F.3d 1345, 1358 (Fed. Cir. 2018).  The Federal Circuit, however, disagreed and upheld the Court of Federal Claims' decision, finding that the VBA and the JWOD Act conflicted, and that the VBA as the later and more specific statute took priority over the JWOD Act.  *Id.* at 1359.

### H.     The May 20, 2019 Class Deviation

On May 20, 2019, while this case was stayed, the VA issued on its website the 2019 Class Deviation in response to the Federal Circuit's mandate in the *PDS* appeal.  The 2019 Class Deviation took immediate effect, expressly contains no exceptions, applies to all VA procurements, and expires only when incorporated into the VAAR or otherwise rescinded.  Ex. A. The VA did not submit the 2019 Class Deviation for public notice and comment in the Federal Register before its release and implementation.

## IV.   STATUTORY JURISDICTION, STANDING, AND RIPENESS

Before turning to the injunction factors, we briefly address the jurisdictional conditions precedent to review.

### A.     Statutory Jurisdiction

The Court may issue the requested injunctive relief pursuant to the APA, 5 U.S.C. §§ 701–706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.  Section 705 of the APA specifically authorizes the Court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705; *see e.g.*, *Sumpter v. Sec'y of Labor*, 763 F.3d 1292 (11th Cir. 2014) (reviewing the Federal Mine Safety and Health Review Commission's interpretation of a statute under the APA); *Mich. Dep't of Educ. v. U.S. Dep't of Educ.*, 875 F.2d 1196 (6th Cir. 1989) (reviewing the validity of the U.S. Department of Education's action under the APA).  The

Declaratory Judgment Act similarly permits the Court to award "[f]urther necessary or proper relief based on a declaratory judgment . . . ."  28 U.S.C. § 2202.

      **B.**      **Plaintiff SourceAmerica Has Both Direct and Organizational Standing.**

SourceAmerica has standing to sue both on its own behalf and on behalf of its members. SourceAmerica is required to fund its operations by charging fees that are "based on nonprofit agency sales to the Government under the AbilityOne Program." 41 C.F.R. § 51-3.5.  Because the 2019 Class Deviation will directly impact sales from nonprofit agencies, it will necessarily negatively impact the revenue stream from which SourceAmerica receives its funding.

SourceAmerica also has organizational standing because: (1) SourceAmerica's members, such as Bayaud,[25] would otherwise have individual standing to sue in their own right; (2) SourceAmerica seeks to protect the contracting interests of its members, and federal regulations implementing the JWOD Act specifically grant SourceAmerica the authority to address, among other things, "[d]isputes between a nonprofit agency and a contracting activity. . . ." (41 C.F.R. § 51-6.15; *see also* 41 C.F.R. Part 51-3); and (3) this suit addresses a purely legal question that affects SourceAmerica's specific mission.  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (enumerating elements for organizational standing).

      **C.**      **This Matter Is Ripe for Review.**

The Court considers four factors in determining "the ripeness of challenges to federal agency action":  (i) "whether the issues involved are purely legal"; (ii) "whether the agency's action is final"; (iii) "whether the action has or will have an immediate impact on the petitioner"; and (iv) "whether resolution of the issue will assist the agency in effective enforcement and

---

[25] Bayaud has standing because the 2019 Class Deviation directly threatens three of Bayaud's existing contracts and the livelihood of 42 of its significantly disabled employees, including 12 service veterans with significant disabilities. *See* Section VI.A, *infra*.

administration." *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1219 (10th Cir. 2017) (citations omitted). When these conditions are met, a challenge to an ongoing administrative process is ripe for APA review, and not just a challenge to decisions resulting from that process. *See id.* at 1219–21 & n.6 (citations omitted).

Here, the Court is presented with a purely legal question as to the proper prioritization of the JWOD Act's Procurement List mandate vis-à-vis the VBA's Rule of Two, and whether the VA's current policies and practices violate the law. The VA issued the 2019 Class Deviation on May 20, 2019, and per its terms, it immediately implements the VA's interpretation of the VBA, the JWOD Act, associated regulations and relevant case law. The VA also took the position on June 4, 2019 that it does not need to require VOSBs or SDVOSBs to purchase goods or services from the Procurement List, in violation of applicable laws. Plaintiffs dispute the VA's interpretation of these various laws and regulations, and this disagreement has a direct impact on Plaintiffs. Resolution of this matter will also assist the VA in effective administration of its obligations under the JWOD Act, VBA, and associated regulations. Having satisfied each of the ripeness conditions, this matter is appropriate for judicial review.

## V.     LEGAL STANDARD

"A request for a temporary restraining order under [Federal Rule of Civil Procedure] 65(b) is examined under the same standards applicable to a request for preliminary injunction under Rule 65(a)." *Watts v. Karmichael Family, LLC*, No. 07-cv-00638, 2007 WL 1059051, at *1 (D. Colo. Apr. 4, 2007) (citation omitted). Plaintiffs must establish: (i) "a substantial likelihood of prevailing on the merits"; (ii) "irreparable harm unless the injunction is issued"; (iii) "that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party"; and (iv) "that the injunction, if issued, will not adversely affect the public interest." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (citation omitted).

Courts regularly preserve the status quo by enjoining federal agencies from implementing and enforcing regulatory policies pending litigation challenging those policies. *See, e.g.*, *Associated Builders & Contractors of Se. Tex. v. Rung*, No. 1:16-cv-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016). In the federal procurement context, a nationwide injunction is appropriate "because partial implementation of a federal rule would detract from the integrated scheme of regulation created by Congress." *Id.* at *15 (alteration omitted) (internal quotation marks omitted) (citing, *inter alia*, *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015)); *see also Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1085 (11th Cir. 2013) (affirming preliminary injunction of Department of Labor rules and stating: "On appeal, DOL argues that it is harmed by having its entire regulatory program called into question. This is not an appealing argument. If the entire regulatory program is *ultra vires*, then it should be called into question." (internal quotation marks omitted)). Entry of a nationwide injunction is warranted where "[p]artial implementation" of the challenged agency action "would detract[] from the integrated scheme of regulation created by Congress, and there is a substantial likelihood that a geographically-limited injunction would be ineffective." *See Texas v. United States*, 809 F.3d at 188 (second alteration in original) (citation and internal quotation marks omitted).

## VI.   ARGUMENT

Plaintiffs satisfy each of the four requirements for injunctive relief.

### A.   Plaintiffs Will Suffer Irreparable Harm.

Defendants' actions threaten Plaintiffs and nonprofit agencies across the country with immediate, irreparable harm. "[A] plaintiff satisfies the irreparable harm requirement by demonstrating a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (citation and internal quotation marks omitted). Said differently, "[i]rreparable harm, as the

name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Tribune Publ'g Co., LLC v. AT & T Corp.,* 320 F.3d 1081, 1105 (10th Cir. 2003) (citation omitted).

Loss of the opportunity to engage in normal life activities and pursue a chosen profession constitutes irreparable harm.  *See Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1165−1167 (9th Cir. 2011) (finding lack of opportunity to sit for bar exam because of failure to provide accommodations constituted irreparable injury); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (finding that policy limiting plaintiffs' ability to obtain driver's licenses, combined with fragile socio-economic status and young age, caused irreparable harm by limiting professional opportunities).  An "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, . . . and lost opportunities to distribute unique products" are also factors supporting irreparable harm. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263−64 (10th Cir. 2004) (citing cases).

The VA's actions threaten scores of disabled workers with irreparable harm because the 2019 Class Deviation will eliminate unique opportunities for significantly disabled persons to obtain meaningful work and participate in activities of daily life.  There are 63 contracts across the country at risk of being cancelled as a result of the VA's 2019 Class Deviation between now and October 1, 2019, totaling $38,873,409.13 in annual contract value.  Decl. of Vincent Loose, Ex. B ¶ 9.  These at-risk contracts provide employment for approximately 600 significantly disabled persons, including nearly 90 disabled veterans.  *Id.* ¶ 10. Bayaud's contracts alone provide employment for 42 significantly disabled persons, including 12 disabled veterans.  Decl. of David Henninger, Ex. C ¶¶ 10−13.  The VA's actions will eliminate these jobs here in Colorado and

nationwide. *Id.* ¶ 16 ; Decl. of Vincent Loose, Ex. B ¶ 11. These jobs are more than a paycheck. Decl. of Vincent Loose, Ex. B ¶ 14; *see also* Decl. of David Henninger, Ex. C ¶ 3. Eliminating them will result in harm that cannot be undone for the workers that depend on them for their sense of self, dignity, and livelihood. Decl. of Vincent Loose, Ex. B ¶ 14.

The necessity of these jobs is demonstrated by the nonprofit agencies' qualifications, programs and services. In order to qualify for Procurement List contracts, nonprofit agencies must have documentation to support that at least 75% of the people they are staffing on those contracts are significantly disabled and that they are "not competitively employable," meaning that they could not qualify for or maintain competitive employment. Decl. of Vincent Loose, Ex. B ¶ 4; Decl. of David Henninger, Ex. C ¶ 5. Nevertheless, in order to provide high-quality service to customers and remain competitive as a nonprofit agency, the nonprofit agencies, including Bayaud, must ensure that their employees, who are not competitively employable, meet a competitive labor standard. Decl. of Vincent Loose, Ex. B ¶ 5; Decl. of David Henninger, Ex. C ¶ 6. Bayaud, like other nonprofit agencies, ensures this high-quality service to its customers by providing employees with individualized supportive services and accommodations above and beyond ADA requirements, such as "employment training, assessment, coaching, placement, and supported employment." Decl. of David Henninger, Ex. C ¶¶ 6–8; Decl. of Vincent Loose, Ex. B ¶ 6. Employers outside of the AbilityOne program generally do not provide these services to disabled employees, nor are they required to do so. Decl. of Vincent Loose, Ex. B ¶ 7; Decl. of David Henninger, Ex. C ¶ 6. In this respect, employment under the auspices of the AbilityOne program is unique.

For example, at the outset of any employment relationship, Bayaud performs an individualized intake assessment to determine a suitable job or path, as well as which supportive

services the employee will require.  Decl. of David Henninger, Ex. C ¶ 7.  Bayaud provides temporary supervised work experience and feedback for new employees who are not ready to enter the workforce, as well as Microsoft, QuickBooks, and customer service training.  *Id.*  Furthermore, Bayaud reassesses employees' needs on a quarterly basis and provides ongoing support to help employees navigate on-the-job difficulties, benefits, and medical treatment.  *Id.*

Bayaud primarily employs individuals with a mental health diagnosis or traumatic head injuries/other physical disabilities.  *Id.* ¶ 3.  Because many of its employees can experience periods of episodic re-occurrence of symptoms that result in a need for treatment and recovery, Bayaud is specially equipped to respond to changes in the needs of its employees.  *Id.* ¶ 8.  For example, Bayaud trains site supervisors to identify the warning signs of relapse and to provide appropriate and immediate support.  *Id.*  Additionally, if an employee requires time off for treatment, Bayaud maintains flexibility to backfill the position immediately on a temporary basis and to allow the employee to return to his or her position upon recovery.  *Id.*  Without this specialized support, Bayaud's employees would be unable to retain competitive employment.  *Id.* ¶ 9.

The critical importance of these contracts to significantly disabled persons, their ability to participate in employment, and their ability to support themselves instead of surviving on government benefits cannot be overstated.  As noted above, the majority of workers employed on these contracts have already been determined to be unable to find work in the marketplace.  Many were unemployed and living on federal benefits before gaining employment through a SourceAmerica nonprofit agency.  Historically, the significantly disabled suffer from high levels of unemployment.  *See* Decl. of Vincent Loose, Ex. B ¶ 14.  According to the 2017  U.S. Census Bureau American Communities Survey: of the 20 million working age, non-institutionalized people with disabilities, 64.1% do not have jobs.  *Id.*  Taking away these jobs thus takes away their

ability to work.  *Id.*; Decl. of David Henninger, Ex. C ¶ 9.  This harm cannot be remedied with money damages.  Indeed, Plaintiffs cannot even seek monetary relief for the types of claims asserted here.  *See* 5 U.S.C. §§ 701−706 (providing for declaratory and injunctive relief only); and 28 U.S.C. §§ 2201−2202 (same).  Therefore, absent injunctive relief, scores of significantly disabled persons (many of whom are veterans) will lose their jobs without an adequate remedy at law and will be separated from the jobs they have performed for years.

Not only do the VA's actions threaten significantly disabled workers, they also threaten the nonprofit agencies who employ them with irreparable harm.  Bayaud currently has three Procurement List contracts with the VA that will expire on June 24, 2019, September 30, 2019 and March 31, 2020.  Decl. of D. Henninger, Ex. C ¶¶ 11−13.  Loss of these contracts will cause severe financial harm to Bayaud that cannot be compensated with money damages after-the-fact.  *See id.* ¶ 17.  To offset the substantial lost revenue, Bayaud will have to cut back on providing support services, the loss of which will also impact individual livelihoods.  *See id.*  Indeed, support staff and other staff providing indirect labor on Bayaud's VA contracts, including at least one veteran, will lose their jobs if the VA is permitted to enforce the 2019 Class Deviation and compete these contracts.  *Id.*  The harm to the Bayaud and the individuals it employs cannot be quantified.

Loss of the contracts of numerous other SourceAmerica nonprofit agencies around the country that expire in 2019 and beyond will also cause irreparable harm.  For example, Project Hired currently performs a VA switchboard operation contract in California at three different locations.  Decl. of Vincent Loose, Ex. B ¶ 16.  These contracts are the main source of revenue for Project Hired.  *Id.*  The VA provided affirmative notice to Project Hired on June 4, 2019 that after a six-month extension to the current contract, "this contract will be awarded to SDVOSB."  *Id.* ¶ 17.  While the VA indicated that it would push for the vendors to hire Project Hired's current

workers, it stated that it could not guarantee that would occur and acknowledged that the vendors could "renege" on their "promise." *Id.*

Project Hired will close its doors within weeks if the VA is not enjoined from applying the Rule of Two. *Id.* ¶ 18. Loss of an entire business constitutes irreparable harm. *See, e.g., Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d. Cir. 1995). If Project Hired goes out of business, the nearly 125 individuals that Project Hired serves each year will lose their jobs and will be unable to find employment in the competitive market. Decl. of Vincent Loose, Ex. B ¶ 18. Project Hired is also a referral source for other nonprofit agencies in the SourceAmerica network, and it serves as a local resource for other national nonprofit agencies. *Id.* If it goes out of business, Project Hired will also be unable to provide referrals to other nonprofit agencies. *Id.* ¶ 19.

Similarly, CRI Federal Services, a nonprofit agency performing patient medical transport services in Texas, will cease to exist after 25 years of providing employment to persons with disabilities, including disabled veterans, under the AbilityOne program. *Id.* ¶ 20. If CRI loses this contract, 66 individuals with significant disabilities, including 22 disabled veterans, will lose their jobs and will be unable to find employment in the competitive market. *Id.*

As another example, Huntsville Rehabilitation Services and North Bay Rehabilitation perform Strategic Acquisition Center contracts for internment flags. *Id.* ¶ 21. The fact that internment flags are made by people with significant disabilities, including many veterans with disabilities, has been a favorite success story of the AbilityOne program. *Id.* These contracts are set to expire on July 31, 2019. *Id.* The VA has already communicated that it no longer intends to purchase flags from these nonprofit agencies after this date—on June 6, 2019, the VA stated that "[a]s a result of [the 2019 Class Deviation], VA cannot issue any renewal letters at this time for

the flag purchases." *Id.* It also sent out a sources sought notice for internment flags to replace these nonprofit agencies on these contracts. *Id.* As a result, internment flags will no longer be purchased through the AbilityOne program and approximately 43 significantly disabled employees will lose their jobs, including 4 veterans with disabilities. *Id.*

Goodwill Industries of North Louisiana Inc. is another nonprofit agency whose operations and mission will be jeopardized if the VA is allowed to enforce the 2019 Class Deviation. *Id.* ¶ 22. Goodwill Industries of North Louisiana Inc. performs a switchboard operations contract for the VA. *Id.* If Goodwill loses this contract, an estimated 10 employees would lose their jobs. *Id.* Additionally, the jobs of other support staff, including human resources staff who work directly with significantly disabled employees, supervisory staff who supervise significantly disabled employees, and accounting and workforce development personnel, would be at risk. *Id.*

In addition, the financial impact to Goodwill Industries of North Louisiana would be devastating. *Id.* ¶ 23. Goodwill Industries of North Louisiana expects to provide approximately $337,053 in services to the VA for 2019. *Id.* The total contract cost over the current base year plus option years is expected to total $2,205,260.63. *Id.* This contract represents approximately 28% of the billing of Goodwill Industries of North Louisiana's Contracts Division. *Id.* The financial impact of the loss of Goodwill Industries of North Louisiana's switchboard operations contract with the VA would affect not only the individuals employed on that contract but also other individuals served by the organization's reinvestment of profits made on the contract after expenses. *Id.* ¶ 24. Based on current data from Goodwill's Workforce Development division, losing this contract would keep Goodwill from being able to serve approximately 557 persons per year. *Id.*

For years, these nonprofit agencies have been the exclusive, mandatory source for many goods and services procured by the VA.  The VA's recent unlawful policy change not only eliminates this exclusivity, but also prevents the nonprofit agencies from even competing for these contracts because the Rule of Two limits competition to veteran-owned small businesses, and by definition, nonprofit agencies cannot and do not qualify.    13 C.F.R. 121.105(a).   The VA is sending cancellation notices and notices of non-renewal to nonprofit agencies across the country in reliance on the 2019 Class Deviation.  Decl. of Vincent Loose, Ex. B ¶ 25.  The 2019 Class Deviation, which improperly prioritizes the Rule of Two over the Procurement List mandate, places the exercise of any options on these contracts, and re-award to the incumbent nonprofit agency as a mandatory source, at immediate risk as well.

An injunction is therefore necessary to protect the nonprofit agencies, SourceAmerica, and the significantly disabled individuals the nonprofit agencies employ from irreparable harm.

## B. Plaintiffs Have A Substantial Likelihood of Prevailing on The Merits.

Plaintiffs are likely to prevail on the merits of their APA claims because: (1) the 2019 Class Deviation's prioritization of the VBA's Rule of Two over the JWOD Act's Procurement List mandate is arbitrary, capricious, and contrary to law; (2) the VA failed to promulgate the 2019 Class Deviation in accordance with notice-and-comment requirements; and (3) the VA's other practices and/or procedures are contrary to law.  Each of these grounds are sufficient on their own to demonstrate a likelihood of success on the merits.  Together, they overwhelmingly favor an injunction.

### 1. The 2019 Class Deviation is Arbitrary, Capricious, and Contrary to Law.

The APA directs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be": "(A) arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law"; "(B) contrary to constitutional right, power, privilege, or immunity"; or "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

The parties here offer competing interpretations of the relative priority of the JWOD Act's Procurement List and the VBA's Rule of Two. Plaintiffs interpret the JWOD Act to require federal agencies like the VA to use "mandatory sources" like the AbilityOne Procurement List *before* resorting to procurement through competing contracts among non-mandatory sources, including veteran-owned small businesses ("VOSBs") and service-disabled veteran-owned small businesses ("SDVOSBs"). If, and only if, the VA determines that there is no available mandatory source for the needed good or service, the VBA then requires the VA to prioritize VOSBs and SDVOSBs over *other non-mandatory sources*, such as woman-owned small businesses. Until the Federal Circuit's decision in *PDS*, the VA agreed with Plaintiffs' interpretation of the relevant statutes and regulations.

Now, however, Defendants interpret the VBA to "take[ ] precedence" over the JWOD Act's Procurement List and to require use of the Rule of Two for all competitive and *non-competitive* procurements, even when mandatory sources exist to fulfill the VA's needs. Ex. A. Defendants' interpretation violates existing law because it fails to give proper effect to the overall statutory framework and improperly creates an irreconcilable conflict between the two statutes. Defendants' new-found position as formalized in the 2019 Class Deviation is contrary to the text, purpose, and history of the applicable statutes.

a. <u>The Text Does Not Expressly or Implicitly Support that the VBA Repeals the JWOD Act.</u>

Statutory interpretation begins with the relevant text. *See, e.g., Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) ("As in any statutory construction case, we start, of course, with the statutory text.

-20-

. . ." (alteration omitted) (citation and internal quotations omitted)); *see also* Unif. Statute & Rule Construction Act § 19 (1995) ("*Primacy of Text.* The text of a statute or rule is the primary, essential source of its meaning").  If the text is clear, the inquiry ends, and the Court must enforce the law as written.  *See Schein v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (When interpreting text, courts may not "redesign the statute" or "engraft [their] own exceptions onto the statutory text."); *Matson Nav. Co. v. United States*, 284 U.S. 352, 356 (1932), superseded on other grounds by Act of June 25, 1948, ch. 646, 62 Stat. 942 (codified at 28 U.S.C. § 1500) (Where the words of a statute are clear, courts "are not at liberty to add to or alter them to effect a purpose which does not appear on its face or from its legislative history.").

The JWOD Act provides that the U.S. AbilityOne Commission "shall maintain and publish in the Federal Register a [P]rocurement [L]ist."  41 U.S.C. § 8503(a)(1).  Once the U.S. AbilityOne Commission completes a public notice-and-comment process and places a good or service on the Procurement List, the good or service becomes a mandatory source for government purchasers and a contracting agency "shall procure" the item from the Procurement List-designated nonprofit agency:

> **(a) In general.** — An entity of the Federal Government intending to procure a product or service on the procurement list referred to in section 8503 of this title *shall* procure the product or service from a qualified nonprofit agency for the blind or a qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled in accordance with regulations of the Committee and at the price of the Committee establishes if the product or service is available within the period required by the entity.
>
> **(b) Exception.** — This section does not apply to the procurement of a product that is available from an industry established under Chapter 307 of title 18 and that is required under section 4124 of title 18 to be procured from that industry.[26]

41 U.S.C. § 8504 (emphasis added).

---

[26] 18 U.S.C. Chapter 307 establishes the Federal Prison Industries, Inc., and 18 U.S.C. § 4124 establishes rules governing purchases from the Federal Prison Industries.

The VBA states in relevant part:

**(d)Use of restricted competition.—**

[F]or purposes of meeting the goals under subsection (a), and in accordance with this section, a contracting officer of the Department *shall* award contracts on the basis of competition restricted to small business concerns owned and controlled by veterans or small business concerns owned and controlled by veterans with service-connected disabilities if the contracting officer has a reasonable expectation that two or more small business concerns owned and controlled by veterans or small business concerns owned and controlled by veterans with service-connected disabilities will submit offers and that the award can be made at a fair and reasonable price that offers best value to the United States.

38 U.S.C. § 8127(d) (emphasis added).

Although both statutes prescribe what an agency "shall" do, the potential tension between the two commands can be reconciled by limiting the VBA to competitive, non-mandatory contracts that Congress sought to address in the VBA.

The statutory text supports that the VBA applies only to competitive procurements for which VOSBs and SDVOSBs were already eligible to bid on and compete for before the VBA's passage. Subsection (d) provides that contracts shall be awarded "on the basis of competition," and clarifies that it must be read "for purposes of meeting the goals under subsection (a)." *Id.* The goals stated in (a) are decidedly narrow and relate only to "increase[ing] contracting opportunities *for small business concerns* owned and controlled by veterans and small business concerns owned and controlled by veterans with service-connected disabilities." 38 U.S.C. § 8127(a) (emphasis added). Further, Subsection (d), which effectuates the Rule of Two, is titled "Use of restricted *competition*." 38 U.S.C. § 8127(d) (emphasis added).

Surrounding text in the VBA reinforces this interpretation. Subsection 8127(h) states the priority for procurements under the VBA:

**(h)Priority for contracting preferences.—**Preferences for awarding contracts to small business concerns shall be applied in the following order of priority:

(1) Contracts awarded pursuant to subsection (b), (c), or (d) to small business concerns owned and controlled by veterans with service-connected disabilities.

(2) Contracts awarded pursuant to subsection (b), (c), or (d) to small business concerns owned and controlled by veterans that are not covered by paragraph (1).

(3) Contracts awarded pursuant to—

(A) section 8(a) of the Small Business Act (15 U.S.C. 637(a)); or

(B) section 31 of such Act (15 U.S.C. 657a).

(4) Contracts awarded pursuant to any other small business contracting preference.

38 U.S.C. § 8127(h).   The priorities listed only address priorities for VOSBs and SDVOSBs as they relate to *other small business concerns.*   This is consistent with the goals set forth in 8127(a), which sought to elevate VOSBs and SDVOSBs for VA competitive procurements over other types of small businesses.   Notably, nonprofit agencies that qualify for the Procurement List do not also qualify as "small business concerns" within the meaning of the Small Business Act or related regulations because small business set asides are restricted to companies organized for profit.   13 C.F.R. 121.105(a).   Thus, nowhere does subsection 8127(h) of the VBA or any other VBA subsection reflect a change to the preexisting order of priorities for VOSBs and SDVOSBs in relation to the Procurement List and other mandatory sources.

Indeed, to reconcile Defendants' new interpretation of the VBA with the JWOD Act would require the Court to rewrite Subsection (h) and insert new text where none presently exists.   The 2019 Class Deviation states, in part, "For AbilityOne, if an award is not made to an eligible Vendor Information Pages[]-listed and verified SDVOSB or VOSB under VAAR subpart 819.70, the priority use of AbilityOne applies and supplies and services on the Procurement List are mandatory sources."   Ex. A.   This contradicts 8127(h)'s text and seeks to insert the "Procurement List" after (h)(1) and (h)(2), which prioritizes awards to VOSBs and SDVOSBs, but before (h)(3), which relates to other small business awards.   Thus, according to Defendants, the Court should revise subsection (h) of the VBA to read:

**(h) Priority for Contracting Preferences.**—Preferences for awarding contracts to small business concerns shall be applied in the following order of priority:

(1) Contracts awarded pursuant to subsection (b), (c), or (d) to small business concerns owned and controlled by veterans with service-connected disabilities.

(2) Contracts awarded pursuant to subsection (b), (c), or (d) to small business concerns owned and controlled by veterans that are not covered by paragraph (1).

*(2A) Contracts awarded for supplies and services on the Procurement List as a mandatory source.*

(3) Contracts awarded pursuant to—

> (A) section 8(a) of the Small Business Act (15 U.S.C. 637(a)); or

> (B) section 31 of such Act (15 U.S.C. 657a).

(4) Contracts awarded pursuant to any other small business contracting preference.

(changed and added text in italics). The Supreme Court in *Epic Systems* warned against that approach to statutory analysis because rewriting text disrupts the separation of powers between Congress and the courts: "Our rules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation, not this Court by supposition, both to write the laws and to repeal them." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018).

Section 8128(a) of the VBA provides further context for Section 8127(d)'s intended reach. Section 8128(a) states: "Contracting priority. — In procuring goods and services pursuant to a contracting preference under this title *or any other provision of law*, the Secretary shall give priority to small business concern owned and controlled by veterans, *if such business concern also meets the requirements of that contracting preference.*" 38 U.S.C. § 8128(a) (emphasis added). The last clause expressly provides that the Secretary can only give preference to a VOSB if that VOSB meets the requirements of that contracting preference. As a for-profit business, a VOSB does not qualify as a mandatory source and is not eligible for Procurement List designations.

Had Congress intended for awards to VOSBs and SDVOSBs to take priority over all *mandatory* sources, such as agency excess and the Procurement List, it would have so stated. That

the VBA text is entirely silent on the priority for mandatory procurements supports that Congress did not intend for the VBA to displace mandatory procurements, and instead sought only to re-prioritize VOSBs and SDVOSBs above other small business types for competitive contracts for which they were already eligible.

Relevant canons of statutory interpretation further support Plaintiffs' interpretation.   It is well-established that when a Court interprets two statutes that allegedly act "upon the same subject, the rule is to give effect to both if possible." *United States v. Borden Co.*, 308 U.S. 188, 198 (1939) (citations omitted).   "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the *duty* of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974) (emphasis added).  This is known as the harmonious-reading canon.

Here, Plaintiffs' interpretation of section 8127(d) of the VBA entirely avoids the potential tension between competing "shalls" in the JWOD Act and the VBA, and gives effect to both statutes.  If the VBA's veteran preference is deemed to apply only to *competitive* contracts—that is, only when a mandatory source like the Procurement List is unavailable—the statutes do not conflict at all.  The VA will continue to do what it has always done: first look to the Procurement List to determine if the contract can be filled with a mandatory source, and if none is available, then apply the Rule of Two to afford a relative competitive preference to veteran-owned small businesses.

The harmonious-reading canon also dovetails with the responsibility of courts to presume that Congress does not repeal or override statutes by implication:  "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by

implication is when the earlier and later statutes are irreconcilable." *Id.* at 550; *see also Borden Co.*, 308 U.S. at 198 ("It is a cardinal principle of construction that repeals by implication are not favored.")  This is so "[e]ven when a later enacted statute is not entirely harmonious with an earlier one . . . ."  *United States v. Colorado*, 990 F.2d 1565, 1575 (10th Cir. 1993).  Indeed, courts must be "reluctant to find repeal by implication unless the text or legislative history of the later statute shows that Congress intended to repeal the earlier statute and simply failed to do so expressly." *Id.*

If, as Defendants argue, the Rule of Two must be given effect *before* resort to the Procurement List, then it necessarily follows that the VBA implicitly repeals the JWOD Act's mandatory preference for the AbilityOne program with respect to VA procurements.  Nothing in the VBA's text or history evinces that Congressional intent, let alone expressly.  Perhaps that explains why the VA, for over ten years after the VBA's enactment, continued to apply the JWOD Act's preference as written.

> b.   The Congressional History and Procurement Landscape in Which the VBA Was Enacted Further Support Plaintiffs' Interpretation.

When Congress acts in a particular regulated area, the law presumes that Congress understands the regulatory landscape and does not seek to disrupt other statutes and regulations unless Congress states its intent to do so.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  The historical and regulatory context in which Congress passed the VBA bolsters the textual analysis above.  It demonstrates that Congress only sought to remedy the VA's failure to meet its small business contracting goals for VOSBs and SDVOSBs by making those goals mandatory rather than permissive—it did not intend, sub silentio, to upend the procurement system more broadly.

As an initial matter, it is important to understand the purpose and context in which Congress passed the JWOD Act and the VBA.  The JWOD Act was passed to create jobs for people who would otherwise be unable to secure competitive jobs in the marketplace.  *See* 41 U.S.C. §§ 8501–8506.  To effectuate this purpose, AbilityOne nonprofit agencies were designated as mandatory source requirements, effectively redirecting federal procurement dollars from competitive procurements to the AbilityOne program.  41 U.S.C. §§ 8501–8506

By contrast, the VBA was passed to address several veteran-focused issues, including the VA's failure to meet small business contracting goals and to force the VA to meet these competitive procurement goals for VOSBs.  In 2003, Congress amended the Small Business Act to give contracting authorities *discretion* to prioritize VOSBs and SDVOSBs in competitive procurements over other small business concerns and set goals for such procurements.  Following its passage, however, the VA did not meet the Small Business Act's discretionary goals.  Legislators did not hide their disappointment: "There would be a reasonable expectation, Mr. Speaker, that [ ] of [all] the Federal Government's agencies [ ] the Department of Veterans Affairs would be a leader in achieving the President's goal for annual procurement from at least 3 percent of the disabled veteran-owned businesses. Sadly, our most recent data from fiscal year 2005 indicates that the VA did barely over half of what the President directed and the public law required."  152 Cong. Rec. H9014 at 1130 (statement of Rep. Buyer).

In response to this shortcoming, Congress passed the VBA to "improve[] the status of veteran and disabled veteran small businesses *when competing for contracts* at the Department of Veterans Affairs." *Id*.  The bill was intended to "establish priority of veteran and service-disabled veteran small businesses *relative to other set-aside groups*" and to ensure "that any veteran or service-disabled veteran-owned small business *that also qualifies under another category* be given

priority within that category in VA procurement."  H.R. Rep. No. 109-592, at 17 (2006)(emphasis added).  This limited objective supports the conclusion that Congress intended only for the VA to prioritize VOSBs and SDVOSBs in some, but not all, procurements.  It certainly does not support that Congress intended to displace mandatory procurements to nonprofit agencies that employ significantly disabled individuals in favor of VOSBs or SDVOSBs.

The broader regulatory context in which the VBA was passed further indicates that Congress did not intend to displace the Procurement List or the VA's obligation to use mandatory sources before awarding competitive contracts to VOSBs or SDVOSBs.  Before Congress passed the VBA, the Federal Acquisition Regulation ("FAR")[27] expressly distinguished between mandatory and non-mandatory sources for procurement and dictated when such sources were to be used.  Specifically, FAR Part 8 "deals with prioritizing sources of supplies and services for use by the Government."  48 C.F.R. § 8.000.  The FAR breaks the sources of supplies and services into two categories—mandatory and non-mandatory.  48 C.F.R. § 8.002; 48 C.F.R. § 8.004. Significantly, the other mandatory sources the FAR identifies include, for example, "[i]nventories of the requiring agency" and "[e]xcess from other agencies," in addition to goods and services included on the Procurement List.  48 C.F.R. § 8.002

Only if a "mandatory source" is unavailable may an agency consider so-called "non-mandatory sources" in the marketplace or "other sources."  The FAR provides: "When satisfying requirements from non-mandatory sources, see 7.105(b) and part 19 regarding consideration of small business, veteran-owned small business, service-disabled veteran-owned small business,

---

[27] Title 48 of the C.F.R. is commonly referred to as the "Federal Acquisition Regulation" or the "FAR."  These procurement regulations are promulgated by the Federal Acquisition Regulatory Council, and they generally apply to all contracting agencies.  Additionally, Title 48 includes agency-specific procurement regulations, such as the "VA Acquisition Regulation" (or "VAAR").

HUBZone small business, small disadvantaged business (including 8(a) participants), and women-owned small business concerns." 48 C.F.R. § 8.004.  Specifically, FAR Subpart 19.5 provides that the small business set aside requirements *do not apply* to purchases from the Procurement List.  48 C.F.R. § 19.502-1(b).  FAR Subpart 8.7 also specifically elevates purchases from "AbilityOne participating nonprofit agencies" over purchases from "[c]ommercial sources," 48 C.F.R. § 8.704(a), and states that "[n]o other provision of the FAR shall be construed as permitting an exception to the mandatory purchase of items on the Procurement List," 48 C.F.R. § 8.704(b).  Thus, the federal Government identified VOSBs and SDVOSBs as a "non-mandatory source," and the Procurement List as "mandatory source."  That differentiation remains in place today.

In practice, this means that once the AbilityOne Commission completes a public notice-and-comment process and places a good or service on the Procurement List, the good or service becomes a mandatory source for agencies and a contracting agency "shall procure" the item from the Procurement List-designated nonprofit agency.  41 U.S.C. § 8504 (identifying exception only for supplies from Federal Prison Industries, Inc.—another mandatory source).

It was against this regulatory backdrop that Congress passed the VBA.  Nowhere in the VBA does Congress express an intent to disrupt these preexisting regulations and laws that distinguish between mandatory and non-mandatory sources.  Instead, the VBA sets annual contracting goals for when the VA awards competitive contracts, which, when read in conjunction with the FAR and the JWOD Act, occurs only if there are no available mandatory sources.  Only then does the VBA require VA contracting officers to apply the "Rule of Two" and "award contracts *on the basis of competition* . . ." to VOSBs and SDVOSBs.  38 U.S.C. § 8127(d) (emphasis added).  When the Procurement List includes a good or service that is available from a

designated nonprofit agency, such as Bayaud, the mandatory source Procurement List takes priority over any non-mandatory commercial source, veteran-owned or otherwise.

This interpretation also makes logical sense.  If the VA were correct that the VBA takes precedence over all mandatory sources, then the VA would be prohibited from using inventories within the VA and excess from other agencies, which are both "mandatory sources," without first applying the Rule of Two.  48 C.F.R. § 8.002.  This would result in unnecessary waste and excess throughout the government, and require the VA to disregard available goods already within the federal government's inventory.  Likewise, if a VOSB needs to purchase an item and that item is on the Procurement List, the VOSB itself would then have to purchase the item from the Procurement List-designated nonprofit agency.  *See* 48 C.F.R. § 8.002(c) ("The statutory obligation for Government agencies to satisfy their requirements for supplies or services available from the Committee for Purchase From People Who Are Blind or Severely Disabled also applies when contractors purchase the supplies or services for Government use.").  This would lead to wasteful circular purchasing.

Defendants' position—that Congress overhauled so many statutes and regulations without even passing mention—defies both the canon against implied repeals and common sense.

### c.    The VA and Others Have Long Harmonized the Statutes.

The fact that the VA and others have interpreted the VBA and JWOD Act harmoniously for years shows that they can be read harmoniously.  As noted in Section III.E., the VA's initial regulations implementing the VBA confirmed the primacy of the JWOD Act's Procurement List requirements over the VBA's Rule of Two.  Indeed, throughout the *PDS* case at both the Court of Federal Claims and the Federal Circuit, the VA took the same position that Plaintiffs take here— that the JWOD Act's Procurement List takes priority over the VBA's Rule of Two.  It is only in response to the *PDS* decision that the VA is now changing its longstanding position on this issue.

The GAO and the AbilityOne Commission also previously affirmed that the Procurement List takes precedence over the VBA Rule of Two. *See* Procurement List; Additions and Deletions, 81 Fed. Reg. 51863-02, 2016 WL 4138446 (Aug. 5, 2016); *see Fiskars Brands, Inc. dba Gerber Legendary Blades*, B-412730, B-412730.2, May 20, 2016, 2016 CPD ¶ 139 (An "agency may not issue an SDVOSB sole-source (or set-aside) award if the procurement would otherwise be made using Federal Prison Industries . . . or the Javits-Wagner-O'Day (JWOD) Act." (internal citations omitted)).   That the VA, the AbilityOne Commission, and GAO saw no conflict between the VBA's Rule of Two and the JWOD Act's Procurement List demonstrates that the VBA and JWOD Act can and should be read harmoniously.

d.      The Federal Circuit's Decision in the *PDS* Case Is Wrong.

The Federal Circuit's decision in *PDS* to disregard the JWOD Act in favor of the VBA's procurement preferences is riddled with analytical errors. The Court should disregard the *PDS* decision for several reasons.

First, it is questionable whether the Court of Federal Claims had jurisdiction to decide the issues presented in *PDS* and whether the Federal Circuit decided this issue correctly on appeal.  Indeed,  the Federal Circuit ignored its own precedent from *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1135 (Fed. Cir. 1998), which supports that a challenge to regulatory provisions such as that asserted in *PDS* belongs in U.S. district court, not in a bid protest at the Court of Federal Claims.  *See also Fire-Trol Holdings LLC v. U.S. Forest Service*, 209 Fed.Appx. 625 (9th Cir. 2006) (holding that U.S. district courts, and not the Court of Federal Claims, have jurisdiction challenge to rule-making procedures.")  PDS sought to change the regulations, and has now accomplished that goal through an order from a court that lacked jurisdiction in the first instance.

Second, while the Federal Circuit paid lip-service to the strong presumption against repeal by implication and its affirmative duty to harmonize the statutes if possible, the court did not faithfully apply these canons of statutory interpretation. The Federal Circuit instead adopted an interpretation of the VBA that created an irreconcilable conflict with the JWOD Act, rather than one that harmonized the statutes. The court then decided that the "later" and more "specific" provision in the VBA should take priority over the JWOD Act, thereby improperly applying canons of last resort before exhausting the other possibilities. This approach disregarded the Supreme Court's caution that "[a]llowing judges to pick and choose between statutes risks transforming them from expounders of what the law *is* into policymakers choosing what the law *should be*." *Epic Sys. Corp.*, 138 S. Ct. at 1624 (emphasis in original). This approach also ignores that the JWOD Act and the VBA were passed in different contexts to address different and unrelated policy concerns.

Third, the Federal Circuit's wooden approach to statutory interpretation ignored relevant indicia of legislative intent. For example, the Federal Circuit ignored that Congress is presumed to have understood the regulatory framework in which it passed the VBA. Congress passed the VBA against the relevant backdrop of several relevant FAR subparts, including 48 CFR §§ 8.002, 8.004, and 8.704(b), which had for years recognized the distinction between mandatory sources, such as the Procurement List, and nonmandatory sources, such as competitive procurements to VOSBs and SDVOSBs. The court dismissed the applicability of these regulations with little analysis, thereby viewing the VBA in a vacuum instead of in the context of the existing complex procurement system and the interplay between the FAR and relevant statutes. The Federal Circuit also failed to address the irrational consequences its decision creates with respect to agency excess. It ignored that its decision will lead to waste within the government because its decision now

elevates purchases from VOSBs above all other sources, *including first using excess within the VA itself*. Further, while the Federal Circuit cited sections 8127(h) and 8128(a) of the VBA, it did not address their textual relevance. The Federal Circuit did not even analyze the impact of section 8127(h) in relation to 8127(d), and it ignored the final clause of 8128(a), which clarifies that the priorities for contracting to VOSBs applies only if the VOSB qualified for the procurement in the first instance. *See supra* p. 24.

Fourth, the Federal Circuit misapplied the Supreme Court's *Kingdomware* decision by expanding the Supreme Court's decision beyond the context in which that dispute arose. *Kingdomware* dealt exclusively with the priority afforded to VOSBs in the context of competitive contracts; the Court had no occasion to consider the VBAs relationship to the AbilityOne program or other mandatory sources. As the Supreme Court has long cautioned:

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Humphrey's Ex'r v. United States*, 295 U.S. 602, 626–28 (1935) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803); *see also Kirtsaeng v. John Wiley & Sons, Inc.,* 568 U.S. 519, 548 (2013) ("[W]e have written that we are not necessarily bound by dicta should more complete argument demonstrate that the dicta is not correct."). *Kingdomware* has no bearing on the question of whether the Rule of Two takes primacy over the Procurement List, because *Kingdomware* involved only the VA's obligations to conduct a Rule of Two analysis prior to engaging in other forms of competitive acquisition after meeting small-business contracting goals. *Kingdomware*

does not speak, in any way, to the relationship between the Rule of Two and the VA's multiple mandatory source obligations.

Finally, the *PDS* decision does not apply beyond the specific procurement at issue in that case. *See, e.g.*, *Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed. Cl. 1, 4–5 (2007). It is undisputed that Bayaud's contracts and the contracts of other SourceAmerica nonprofit agencies were not at issue in the *PDS* appeal. The Federal Circuit's holding in the *PDS* appeal, therefore, has at most persuasive value. For the reasons set forth above, this Court should not be persuaded to join *PDS*'s erroneous conclusion.

In sum, Plaintiffs are likely to succeed on their claim that the 2019 Class Deviation is contrary to law.

### 2.     The VA Violated the APA's Notice-and-Comment Procedures.

The APA requires agencies to follow notice-and-comment procedures when an agency's repeal of existing regulation constitutes a substantive rule change. *See Nat'l Ski Areas Ass'n, Inc. v. U.S. Forest Serv.*, 910 F. Supp. 2d 1269, 1279–80 (D. Colo. 2012); *see also Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41–44 (1983). These procedures applied to the 2019 Class Deviation and the VA failed to follow them.

A class deviation is a policy authorizing or requiring contracting actions that are inconsistent with a FAR provision (here VAAR 808.002) across multiple acquisitions. *See* 48 U.S.C. Subpart 1.4. By definition, class deviations are *temporary* exceptions to the FAR. "When an agency knows that it will require a class deviation on a *permanent* basis, it should propose a FAR revision, if appropriate." 48 U.S.C. § 1.404 (emphasis added). Permanent FAR revisions are final legislative rules that must be promulgated through normal APA notice-and-comment procedures. *See* 5 U.S.C. § 553.

The VA promulgated VAAR 808.002 on December 8, 2009 after complying with the APA's notice-and-comment requirements.  VAAR 808.002 requires a Rule of Two analysis under the VBA only for items added to the Procurement List on or after January 7, 2010.  For items added to the Procurement List *before* January 7, 2010, VAAR 808.002 requires that the VA purchase from the listed nonprofit agency as a mandatory source under FAR Subpart 8.7.[28]  VAAR 808.002 remains in force, *see* VA Acquisition Regulation: Supporting Veteran-Owned and Service-Disabled Veteran-Owned Small Businesses, 74 Fed. Reg. 64,619 (Dec. 8, 2009), until rescinded by a FAR revision.  No FAR revision has yet rescinded VAAR 808.002, and the VA has not sought to properly rescind it.  The VA is thus bound to follow its own regulations, and it is arbitrary and capricious for the VA to fail to do so.  The VA is not allowed to circumvent the notice-and-comment procedure by issuing a permanent Class Deviation instead of promulgating the necessary FAR revision.

The VA has further acted arbitrarily and capriciously in issuing the 2019 Class Deviation in violation of current statutes and regulations.  As discussed in Section VI.B.1.d., *supra*, the *PDS* holding does not extend to procurements other than the particular procurement at issue in *PDS*.  Only Congress, the FAR Council (through notice-and-comment procedures), the AbilityOne Commission (through notice-and-comment procedures), and the VA (through notice-and-comment procedures) can change the controlling legal authorities for all other procurements.  The JWOD Act, the AbilityOne Commission, FAR, and VA regulations were neither vacated nor overturned—yet, the VA constructively repeals them by the 2019 Class Deviation and rewrites the VBA.  This violates the APA.

---

[28] For items added to the Procurement List before January 7, 2010, the priorities of procurement specified in VAAR 808.002 are identical to those listed in FAR Subpart 8.002: (1) VA inventories; (2) excess from other agencies; (3) Federal Prison Industries, Inc.; (4) the Procurement List; and (5) wholesale supply sources.

### 3.   The VA's Failure to Require its Contractors to Purchase Goods and Services from the Procurement List Is Contrary to Law.

The VA's current policy or practice of failing to require VOSBs and SDVOSB to purchase goods from the Procurement List, as applicable, does not comply with current law and is an additional violation of the APA.

Section 8.002(c) of the FAR states: "The statutory obligation for Government agencies to satisfy their requirements for supplies or services available from the Committee for Purchase From People Who Are Blind or Severely Disabled *also applies when contractors purchase the supplies or services for Government use*." 48 C.F.R. § 8.002(c) (emphasis added).  This means that when the VA contracts with VOSBs or SDVOSBs under the auspices of the VBA's Rule of Two, the VA must require the VOSB or SDVOSB to purchase goods or services from the Procurement List as needed to fulfill this contract.  Thus, for instance, if a VOSB purchases a good or service listed on the Procurement List for delivery to the Government, the VOSB must acquire the good or service from a designated NPA under the AbilityOne program.

The VA, in communications with at least one NPA, has indicated that it will no longer enforce this regulation.  Decl. of Vincent Loose, Ex. B ¶ 17.  On June 4, 2019, the VA provided notice to Project Hired that it was not planning to renew Project Hired's contract after a six-month extension and that it would instead award the contract to a SDVOSB.  *Id.*  The VA then explained that it had asked the SDVOSB to hire the "current workers" and that the VA would "push" for this to happen.  *Id.*; Ex. B-1.  The VA then stated that while the SDVOSB expressed a willingness to hire workers from the nonprofit agency, the SDVOSB could "of course…renege on that 'promise.'"  Decl. of Vincent Loose, Ex. B ¶ 17; Ex. B-1.  The VA thus indicated that it would not mandate that the SDVOSB comply with applicable Federal regulations, as the VA is required to do.  *See* Decl. of Vincent Loose, Ex. B-1.

This directly violates 48 C.F.R. § 8.002(c).  The VA cannot arbitrarily and capriciously disregard valid laws and regulations.  Nothing in the *PDS* decision addressed this issue, and there is no excuse for the VA's failure to enforce this requirement.

*       *       *

For these reasons, Plaintiffs are likely to succeed on the merits of their APA claims.  The VA's interpretation of the VBA and its practices and/or policies violate numerous statutes and regulations.  The text, context and history all support Plaintiffs' interpretation, a view which the VA and government shared until the Federal Circuit's decision in *PDS*.  This case also raises substantial constitutional questions regarding protections for a vulnerable class—the significantly disabled.  At a minimum, the Court should adopt the Plaintiffs' interpretation of the VBA and the JWOD Act because it furthers the "settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question."  *Gomez v. United States*, 490 U.S. 858, 864 (1989) (citations omitted).

## C.       An Injunction Will Not Harm the VA.

A procuring agency is not harmed where "[a]n order for injunctive relief . . . will simply preserve the status quo and temporarily retain the same rules and guidelines in effect for government contractor selection that have been in place for decades."  *Associated Builders*, 2016 WL 8188655, at *15.  This is especially true where "[t]here is no evidence that employees or the general public will be harmed as a result of this relief."  *Id.*  "[M]ere delay of government enforcement does not constitute sufficient harm to deny injunctive relief."  *Id.* (citation omitted).

The VA's actions in this case amply show that it perceives no harm in continuing to follow its longstanding "practices for selecting contractors until this matter can be concluded with a final decision on the merits."  *See id.*  The VA voluntarily sought a stay in this case and froze implementation of the 2017 Class Deviation pending resolution of the *PDS* appeal in the Federal

Circuit, thereby continuing to follow its prior policies.  There is no emergency that requires the VA to implement the 2019 Class Deviation    This Court should therefore preserve the status quo pending resolution of Plaintiffs' claims, an outcome which has the salutary benefit of saving the jobs of hundreds of significantly disabled employees from nonprofit agencies facing immediate risk from the VA's harmful actions.

### D.  Injunctive Relief Will Further the Public Interest.

"Public policy demands that governmental agencies be enjoined from acting in a manner contrary to the law."  *Id.*, at *15 (citation omitted).  "Beyond that, it is in the public interest to ensure the delivery of economical and efficient services from government contractors to federal government agencies, which would likely be impaired by . . . arbitrary and unnecessary" agency actions.  *Id.*  "The public interest easily favors an injunction" where the "interest the government has identified can be effectively vindicated after a trial on the merits" but the "interest [Plaintiffs] have identified cannot be, given the difficulty of restoring the *status quo ante* if [the challenged agency action] were to be implemented."  *See Texas v. United States*, 809 F.3d at 187 (citation omitted).

Were the VA to proceed in improperly prioritizing the Rule of Two over the Procurement List mandate, the jobs of 600 significantly disabled employees nationwide, 80 to 100 of which are in the VA's Rocky Mountain Network[29] NCO/VISN 19 alone, would be in immediate peril.  The JWOD Act was enacted precisely because "a substantial handicap . . . prevents the [significantly

---

[29] The Rocky Mountain Network is also known as Network Contracting Office ("NCO")/Veterans Integrated Service Network ("VISN") 19.  Each numbered NCO is coextensive with a VISN of the same number.  The VISN is what the patient interacts with on the consumer end.  The NCO is what the nonprofit agency (here Bayaud) interacts with on the vendor end.  NCO/VISN 19 is based in Glendale, Colorado and spans a geographic area of 540,000 square miles across 10 states, serving an area covering the states of Utah, Montana, Wyoming, Colorado, Oklahoma and portions of Idaho, Kansas, Nebraska, Nevada and North Dakota.  *See* https://www.visn19.va.gov/about/index.asp (last visited June 3, 2019).

disabled] individual from currently engaging in normal competitive employment." *See* 41 U.S.C. § 8501(8) (defining "[significantly] disabled individual"). The VA's actions therefore pose an immediate risk to a congressionally recognized public interest in providing employment to those who otherwise would not be competitive in the normal marketplace because of substantial disability. For these reasons, preliminary injunctive relief is strongly in the public interest.

### E.   **Injunctive Relief Should Extend Nationwide.**

In the federal procurement context, injunction on a nationwide basis is appropriate "because partial implementation of a federal rule would detract from the integrated scheme of regulation created by Congress." *Associated Builders*, 2016 WL 8188655, at *15 (alteration omitted) (internal quotation marks omitted)(citing, *inter alia*, *Texas v. United States*, 809 F.3d at 188; *see also Bayou Lawn & Landscape*, 713 F.3d 1080 (affirming preliminary injunction of Department of Labor rules). Entry of a nationwide injunction is warranted where "[p]artial implementation" of the challenged agency action "would detract[] from the integrated scheme of regulation created by Congress, and there is a substantial likelihood that a geographically-limited injunction would be ineffective." *Texas v. United States*, 809 F.3d at 188.

Here, the JWOD Act, AbilityOne Commission regulations, FAR, and VAAR 808.002 have nationwide effect, as does the VA Rule of Two with respect to "non-mandatory," "competitive" procurements. The VA has acted to implement its improper prioritization of the Rule of Two over the Procurement List mandate nationwide, putting SourceAmerica nonprofit agencies and their employees at risk across the United States. It would make little sense to enjoin the VA's threat to nonprofit agencies and their employees in Colorado while leaving at risk the balance of the approximately 50 employees with significant disabilities in NCO/VISN 19 who are not in-District, let alone the balance of the approximately 500 at-risk employees with significant disabilities nationwide. Entry of a nationwide temporary restraining order and preliminary injunction is

therefore necessary to protect Plaintiffs from the VA's acts that undermine a nationwide regulatory program.

## VII.   PRAYER FOR RELIEF

For the reasons stated in the Amended Complaint and in this Motion, Plaintiffs respectfully request entry of a nationwide temporary restraining order and preliminary injunction to preserve the status quo pending final resolution of this matter on the merits.  Such an order or injunction would enjoin Defendants from implementing or enforcing the 2019 Class Deviation in all jurisdictions with at-risk AbilityOne Program nonprofit agencies, and would require the VA to comply with 48 C.F.R. § 8.002(c) regarding the purchase of goods and services by contractors from the Procurement List.  Such relief is necessary to protect Bayaud, SourceAmerica, other SourceAmerica nonprofit agencies, and the significantly disabled individuals they employ from the VA's precipitous, arbitrary, and unlawful actions.

Dated:  June 7, 2019                                     Respectfully submitted,

 /s/  *Kathleen K. Custer*
Kathleen K. Custer
Robert Reeves Anderson
ARNOLD & PORTER KAYE SCHOLER LLP
370 Seventeenth Street, Suite 4400
Denver, Colorado 80202-1370
Telephone:  (303) 863-1000
Facsimile:  (303) 832-0428
Katie.Custer@arnoldporter.com
Reeves.Anderson@arnoldporter.com

Craig A. Holman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 942-5722
FAX:  (202) 942-5999
Craig.Holman@arnoldporter.com

*Attorneys for Plaintiffs Bayaud Enterprises, Inc.*
*and SourceAmerica*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 7th day of June, 2019, a true and correct

copy of the foregoing **PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY**

**RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF** was filed and

served on the following counsel of record through the Court's CM/ECF system and by E-Mail:

> **Peter T. Wechsler**
> U.S. Department of Justice-DC-#883
> Federal Programs Branch
> P.O. Box 883
> 20 Massachusetts Avenue, N.W.
> Washington, DC 20044
> 202-514-2705
> Fax: 202-616-8470
> Email: peter.wechsler@usdoj.gov

> _Rebecca A. Golz_

# EXHIBIT A

**Department of Veterans Affairs**

# Memorandum

Date: May 20, 2019

From: Deputy Senior Procurement Executive

Subj: Class Deviation from VAAR 808.002, Priorities for Use of Government Supply Sources and VAAR Subpart 808.6, Acquisition from Federal Prison Industries, Inc. (VIEWS 00217190)

To: Heads of the Contracting Activities

**1.  Purpose.**  To issue a Class Deviation from Department of Veterans Affairs Acquisition Regulation (VAAR) 808.002, Priorities for Use of Government Supply Sources, and VAAR subpart 808.6, Acquisition from Federal Prison Industries, Inc., in accordance with Federal Acquisition Regulation (FAR) 1.404, Class Deviations, and Department of Veterans Affairs Acquisition Regulation (VAAR) 801.404. This revised Class Deviation supersedes Class Deviation from VAAR 808.002, Priorities for Use of Mandatory Government Sources, dated February 9, 2018, and revises VAAR 808.002 and subpart 808.6 to reflect language consistent with the decision of the United States Court of Appeals for the Federal Circuit (the Federal Circuit) in *PDS Consultants, Inc., v. The United States, Winston-Salem Industries for the Blind,* issued October 17, 2018.

2.  **Summary.**  The Federal Circuit found that the *VA Rule of Two* takes precedence over procuring products or services found on the AbilityOne Procurement List. Therefore, VA is deviating from VAAR 808.002 to reflect a change to require contracting officers to apply the VA Rule of Two to determine whether a requirement should be awarded to service-disabled veteran-owned small businesses (SDVOSBs) and veteran-owned small businesses (VOSBs) under the authority of 38 U.S.C. 8127-28, by using the preferences and priorities in subpart 819.70 prior to considering an award to an AbilityOne non-profit organization or the Federal Prison Industry, Inc.

**3.  VAAR Sections Impacted.**  808.002, Priorities for use of Government supply sources, and subpart 808.6, Acquisition from Federal Prison Industries, Inc. (FPI).

**4.  Effective Date.**  Immediately.

**5.  Expiration Date.**  This deviation expires when incorporated in the VAAR, or is otherwise rescinded.

**6.  Applicability.**  This class deviation applies to all VA contracts (see definition of contract at FAR 2.101).

**7.  Exception.** None.

**8.  Background.** On May 20, 2019, the Federal Circuit issued a mandate effectuating its October 17, 2018 decision in *PDS Consultants, Inc., v. The United States, Winston-Salem*

Page 2
Class Deviation from VAAR 808.002, Priorities for Use of Government Supply Sources
and VAAR Subpart 808.6, Acquisition from Federal Prison Industries, Inc.


*Industries for the Blind* (*PDS Consultants*). In the decision, the Federal Circuit noted that under 38 U.S.C. § 8128(a), the Secretary of Veterans Affairs, when "procuring goods and services pursuant to a contracting preference under [title 38] *or any other provision of law…shall give priority* to a small business concern owned and controlled by veterans, if such business concern meets the requirements of that contracting preference." (emphasis added). The Federal Circuit noted that the phrase "*or any other provision of law*" by its terms encompasses the Javits-Wagner O'Day Act (JWOD), 41. U.S.C. § 8504. Therefore, the Federal Circuit found that where a product or service is on the Procurement List and ordinarily would result in the contract being awarded to a nonprofit qualified under the JWOD, the Veterans Benefits, Health Care, and Information Technology Act of 2006 (the Act), Pub. L. No 109-461, 120 Stat. 3403, 3431-35 (2006) mandates that priority be given to service-disabled veteran-owned small businesses and veteran-owned small businesses.

   **a.  Current VAAR Policy.**  VAAR 808.002 and subpart 808.6 currently state that supplies and services on the AbilityOne Procurement List and supplies provided by Federal Prison Industries, Inc., are mandatory with certain caveats.

   **b.  Need for Deviation.**  This Class Deviation is needed to reflect language consistent with the Federal Circuit's decision in *PDS Consultants, Inc.*, that the Veterans First Contracting Program takes precedence over AbilityOne and Federal Prison Industries.

   The mandate issued by the Federal Circuit created a binding circuit precedent that, when a product or service is on the AbilityOne Procurement List and ordinarily would result in award under the JWOD program, the Act instead unambiguously requires that priority be given to Veteran-owned small businesses.

   Though the Federal Prison Industries (FPI) priority for use of mandatory Government sources set forth at FAR 8.002(a)(iii) and FAR subpart 8.6 was not specifically at issue in the Federal Circuit case, the application of the rationale in the cited case would logically apply to FPI in relation to the Act. For supplies, FPI is a higher priority than the AbilityOne (JWOD) priority at FAR 8.002(a)(iv) and FAR subpart 8.7. VA previously amended the VAAR to allow the agency the discretion to award to a veteran-owned small business when award otherwise would have been made to FPI.

   **c.  New Policy.**  The new policy provides that—
   - Contracting officers shall apply the VA Rule of Two, as implemented in VAAR subpart 819.70, prior to awarding any contract to AbilityOne non-profit organizations or to Federal Prison Industries, Inc.
   - For AbilityOne, if an award is not made to an eligible Vendor Information Pages (VIP)-listed and verified SDVOSB or VOSB under VAAR subpart 819.70, the priority use of AbilityOne applies and supplies and services on the Procurement List are mandatory sources.

Page 3
Class Deviation from VAAR 808.002, Priorities for Use of Government Supply Sources
and VAAR Subpart 808.6, Acquisition from Federal Prison Industries, Inc.

- For FPI, if an award is not made to an SDVOSB/VOSB as provided in subpart
  819.70, FPI remains a mandatory supply source in accordance with FAR 8.002.
- Consistent with FAR 8.002(b), contracting officers may use a source other than
  those listed in VAAR 808.002(a), when the need for supplies or services is of an
  unusual and compelling urgency, and when justified.
- VAAR 808.002 title is revised to reflect the current title at FAR 8.002, "Priorities
  for use of mandatory Government sources" in lieu of the existing VAAR title now
  reflected in the Code of Federal Regulations at 808.002.

**9.  Additional information.** Direct questions or concerns regarding this deviation to the
Office of Acquisition and Logistics (003A), Procurement Policy and Warrant Management
Service (003A2A) via email at VA.Procurement.Policy@va.gov or (202) 632-5288.

 /s/
D. Edward Keller, Jr.

Attachment
Class Deviation VAAR 808.002,  Priorities for Use of Government Supply Sources and
VAAR Subpart 808.6, Acquisition from Federal Prison Industries, Inc.

**Attachment**

**CLASS DEVIATION FROM VAAR 808.002, PRIORITIES FOR USE OF GOVERNMENT SUPPLY SOURCES**

**PART 808—REQUIRED SOURCES OF SUPPLIES AND SERVICES**

**808.002 Priorities for use of mandatory Government sources.**

(a) Contracting activities shall satisfy requirements for supplies and services from or through the mandatory sources listed below in descending order of priority:

(1) Supplies.

(i) VA inventories including the VA supply stock program (41 CFR 101-26.704) and VA excess.

(ii) Excess from other agencies (see FAR subpart 8.1).

(iii) Federal Prison Industries, Inc. (see VAAR 808.603). Prior to considering award of a contract to Federal Prison Industries, Inc, contracting officers shall apply the VA Rule of Two to determine whether a requirement should be awarded to veteran-owned small businesses under the authority of 38 U.S.C. 8127-28, by using the preferences and priorities in subpart 819.70. If an award is not made to a VIP-listed and verified service-disabled veteran-owned small business (SDVOSB)/veteran-owned small business (VOSB) as provided in subpart 819.70, FPI remains a mandatory source in accordance with FAR 8.002.

(iv) *Supplies that are on the Procurement List* maintained by the Committee for Purchase from People Who Are Blind or Severely Disabled, known as AbilityOne (FAR subpart 8.7). Prior to considering award of a contract under the AbilityOne program, contracting officers shall apply the VA Rule of Two to determine whether a requirement should be awarded to veteran-owned small businesses under the authority of 38 U.S.C. 8127-28, by using the preferences and priorities in subpart 819.70. If an award is not made to a VIP-listed and verified SDVOSB/VOSB as provided in subpart 819.70, AbilityOne remains a mandatory source in accordance with FAR 8.002. All new VA requirements must be approved by the Chief Acquisition Officer, via the Senior Procurement Executive, before contacting the Committee to request addition of new items to the Procurement List.

(v) Wholesale supply sources, such as stock programs of the General Services Administration (GSA) (see 41 CFR 101-26.3), the Defense Logistics Agency (see 41 CFR

101-26.6), the Department of Veterans Affairs (see 41 CFR 101-26.704), and military inventory control points.

(2) *Services that are on the Procurement List* maintained by the Committee for Purchase from People Who Are Blind or Severely Disabled, known as AbilityOne (FAR subpart 8.7). Prior to considering award of a contract under the AbilityOne program, contracting officers shall apply the VA Rule of Two to determine whether a requirement should be awarded to veteran-owned small businesses under the authority of 38 U.S.C. 8127-28, by using the preferences and priorities in subpart 819.70. If an award is not made to a VIP-listed and verified SDVOSB/VOSB as provided in subpart 819.70, AbilityOne remains a mandatory source in accordance with FAR 8.002. All new VA requirements must be approved by the Chief Acquisition Officer, via the Senior Procurement Executive, before contacting the Committee to request addition of new items to the Procurement List.

(b) *Unusual and compelling urgency.* The contracting officer may use a source other than those listed in paragraph (a) of this section when the need for supplies or services is of an unusual and compelling urgency (see FAR 6.302-2, 8.405-6 and 13.106-1 for justification requirements).

**CLASS DEVIATION FROM VAAR SUBPART 808.6, ACQUISITION FROM FEDERAL PRISON INDUSTRIES, INC. (FPI)**

**PART 808—REQUIRED SOURCES OF SUPPLIES AND SERVICES**

**Subpart 808.6—Acquisition from Federal Prison Industries, Inc. (FPI)**

**808.603  Purchasing priorities.**

A waiver from FPI is not needed when comparable supplies and services are procured in accordance with subpart 819.70.

EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-01903

**BAYAUD ENTERPRISES, INC.**

     and

**SOURCEAMERICA**

        Plaintiffs,

    v.

**U.S. DEPARTMENT OF VETERANS
  AFFAIRS**

     and

**ROBERT WILKIE, IN HIS OFFICIAL
  CAPACITY AS SECRETARY OF
  VETERANS AFFAIRS**

     and

**UNITED STATES OF AMERICA**

        Defendants.

---

**DECLARATION OF VINCENT LOOSE IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTIVE RELIEF**

---

    I, Vincent Loose, declare as follows:

    1.    I am the President and CEO of SourceAmerica, one of the Plaintiffs in the above-

captioned lawsuit.  I submit this affidavit in support of Plaintiffs' Motion for Temporary

Restraining Order and Preliminary Injunctive Relief.  I have personal knowledge of the facts

stated herein and if called to testify, I could and would competently so testify.

2.     The AbilityOne Commission has designated SourceAmerica as a central nonprofit agency "to represent nonprofit agencies employing persons with [significant] disabilities."

3.     In this role, SourceAmerica represents approximately 417 nonprofit agencies that are actively performing on AbilityOne contracts, including large national nonprofits such as Goodwill Industries and smaller local nonprofits such as Plaintiff Bayaud, and another 294 affiliated NPAs not currently performing AbilityOne contracts.

4.     In order to qualify for Procurement List contracts, participating nonprofit agencies must have documentation to demonstrate that at least 75% of the people they are staffing on those contracts are significantly disabled and "not competitively employable," meaning that they could not qualify for or maintain competitive employment.

5.     However, the paradox is that in order to provide high-quality service to customers and remain competitive as a nonprofit agency, the nonprofit agencies must ensure that their employees, who are not competitively employable, meet a competitive labor standard.

6.     The nonprofit agencies ensure this high-quality service to their customers by providing employees with individualized supportive services and accommodations above and beyond ADA requirements.

7.     Employers that are not participating nonprofit agencies generally do not provide these services to disabled employees, nor are they required to do so.

8.     Numerous participating nonprofit agencies have products or goods on the Procurement List, which the VA purchases and which the VA's challenged actions will impact. These goods and services range from internment flags to medical supplies to mailroom services.

9.      There are 63 contracts across the country at risk of being cancelled as a result of the VA's 2019 Class Deviation between now and October 1, 2019, totaling $38,873,409.13 in annual contract value.

10.      These at-risk contracts provide employment for approximately 600 significantly disabled persons, including approximately 90 disabled veterans.

11.      The VA's actions will thus impact nearly 600 persons with significant disabilities nationwide in the next five months.

12.      In NCO/VISN 19 alone, the annual value of at-risk contracts between the VA and SourceAmerica NPAs is approximately $3.3 million dollars.  Absent an injunction, the VA's actions jeopardize the jobs of approximately 80-100 significantly disabled employees just in NCO/VISN 19.

13.      The VA's decision to apply the Rule of Two to these contracts will prevent hundreds of our country's most vulnerable from being able to earn a living, and will instead give jobs and profits to veteran-owned businesses that are not required to employ any veterans or disabled persons.

14.      Without access to services and employment through nonprofit agencies, the vast majority of the significantly disabled persons, including veterans, the nonprofit agencies serve and employ will be unable to find and maintain competitive, meaningful, and gainful employment.  Historically, the significantly disabled suffer from high levels of unemployment. According to the 2017 U.S. Census Bureau American Communities Survey:  of the 20 million working age, non-institutionalized people with disabilities, 64.1% do not have jobs.  Taking away these jobs will result in harm to their livelihoods and loss of dignity, structure, engagement

3

with society, and sense of self that cannot be measured in money damages.

15.     These contracts are vitally important not only to the significantly disabled who are able to work on them and their families, but also to the nonprofit agencies performing the work.

16.     For example, Project Hired currently performs a VA switchboard operation contract in California at three different locations.  These contracts are the main source of revenue for Project Hired.

17.     The VA provided affirmative notice to Project Hired on June 4, 2019 that after a six-month extension to the current contract, "this contract will be awarded to SDVOSB."  While the VA indicated that it would push for the vendors to hire Project Hired's current workers, it stated that it could not guarantee that would occur and acknowledged that the vendors could "renege" on their "promise."  A true and correct copy of the VA's June 4, 2019 email is attached as Ex. 1.

18.     Project Hired will close its doors within weeks if the VA is not enjoined from applying the Rule of Two.  If Project Hired goes out of business, the nearly 125 individuals that Project Hired serves each year will lose their jobs and will be unable to find employment in the competitive market.

19.     Project Hired is also a referral source for other nonprofit agencies in the SourceAmerica network, and it serves as a local resource for other national nonprofit agencies. If it goes out of business, Project Hired will also be unable to provide referrals to other nonprofit agencies.

20.     Similarly, CRI Federal Services, a nonprofit agency performing patient medical transport services in Texas, will cease to exist after 25 years of providing employment to persons

with disabilities, including disabled veterans, under the AbilityOne program.  If CRI loses this

contract, 66 individuals with significant disabilities, including 22 disabled veterans, will lose

their jobs and will be unable to find employment in the competitive market.

21.     As another example, Huntsville Rehabilitation Services and North Bay

Rehabilitation perform Strategic Acquisition Center contracts for internment flags.  The fact that

internment flags are made by people with significant disabilities, including many veterans with

disabilities, has been a favorite success story of the AbilityOne program.   These contracts are set

to expire on July 31, 2019.   The VA has already communicated that it no longer intends to

purchase flags from these nonprofit agencies after this date—on June 6, 2019, the VA stated that

"[a]s a result of [the 2019 Class Deviation], VA cannot issue any renewal letters at this time for

the flag purchases."   It also sent out a sources sought notice for internment flags.   As a result,

internment flags will no longer be purchased through the AbilityOne program and 43

significantly disabled employees will lose their jobs, including 4 veterans with significant

disabilities.  True and correct copies of the notification emails and solicitation are attached as Ex.

2.

22.     Goodwill Industries of North Louisiana Inc. is another nonprofit agency whose

operations and mission will be jeopardized if the VA is allowed to enforce the 2019 Class

Deviation.  Goodwill Industries of North Louisiana Inc. performs a switchboard operations

contract for the VA.  If Goodwill loses this contract, an estimated 10 employees would lose their

jobs. Additionally, the jobs of other support staff, including human resources staff who work

directly with significantly disabled employees, supervisory staff who supervise significantly

disabled employees, and accounting and workforce development personnel, would be at risk.

23.     In addition, the financial impact to Goodwill Industries of North Louisiana would be devastating.  Goodwill Industries of North Louisiana is budgeted to bill the VA for approximately $337,053 for 2019.  The total contract cost over the current base year plus option years is expected to total $2,205,260.63.  This contract represents approximately 28% of the billing of Goodwill Industries of North Louisiana's  Contracts Division

24.     Furthermore, the financial impact of the loss of Goodwill Industries of North Louisiana's switchboard operations contract with the VA would affect not only the individuals employed on that contract but also other individuals served by the organization's reinvestment of profits made on the contract after expenses.  Based on current data from Goodwill's Workforce Development division, losing this contract would keep Goodwill from being able to serve approximately 557 persons per year.

25.     In addition to the notices described above, the VA is sending cancellation notices and notices of non-renewal to nonprofit agencies across the country in reliance on the 2019 Class Deviation. Compiled as Ex. 3 are examples of the letters and email the VA has sent to other nonprofit agencies.  These are true and correct copies of the correspondence.

26.     Loss of these contracts will further harm most small- to medium-sized nonprofit agencies' goodwill in the community and their ability to obtain future contracts.  In order to qualify for other contracts, nonprofit agencies must submit capability statements that describe past performance and provide references.  Without Procurement List contracts, nonprofit agencies will not have contracts to list on their capability statements.

27.     For example, MQC, a nonprofit agency located in Alaska that currently performs laundry services for the VA, is looking to increase its laundry services footprint in Anchorage,

Alaska.  Losing its VA contract would cause MQC to lose its main reference when approaching other small medical facilities in the Anchorage market, which will reduce its goodwill in the community and its ability to obtain these contracts.

28.     The 2019 Class Deviation will also directly impact SourceAmerica's revenue stream.  The AbilityOne program requires SourceAmerica to fund its operations in support of AbilityOne through charging fees based on nonprofit agency sales to the Government under the AbilityOne program.

29.     Decreased sales from nonprofit agencies will decrease the revenue stream from which SourceAmerica receives its funding, which will materially undermine SourceAmerica's operations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 7th day of June, 2019, at _1:25 PM_.


Respectfully submitted,

Vincent Loose
President and CEO of SourceAmerica

# EXHIBIT B-1

**From:** Johnson, Rico L [mailto:Rico.Johnson@va.gov]
**Sent:** Tuesday, June 04, 2019 7:45 AM
**To:** Sharon Winston
**Subject:** RE: Nondisplacement Clause information from 2017 discussion

Sharon,

I would like to extend the contract for 6 months.  At the end of the 6 months this contract will be awarded to SDVOSB.  I will still push for the new vendor to hire the current workers.  I spoke directly to 2 of the vendors and they said they would be willing to offer jobs to current employees.  Yes, of course they could renege on that "promise" but with keeping in good standing with the VA I don't see that happening.

So do you concur with a 6 month extension?

Rico


Rico Johnson
Contracting Officer
Department of Veterans Affairs
Mon-Fri 0600-1430 PST
McClellan, CA 95652
916-923-4513

**From:** Sharon Winston <sharonw@projecthired.org>
**Sent:** Wednesday, May 29, 2019 8:22 AM
**To:** Johnson, Rico L <Rico.Johnson@va.gov>
**Subject:** [EXTERNAL] Nondisplacement Clause information from 2017 discussion
**Importance:** High


Dear Rico

Hi, here is the correspondence from Mike stating that the right of first refusal does not apply to our Ability One program.  I imagine that was an exception because our operators are disabled and we make accommodations for them to do the work---and a new employer may not wish to do so.  We do have 9-10 veterans working for us
and all fall into this category.

Thank you for the call this morning.  I look forward to your update next week.


my best, Sharon

**From:** Hodahkwen, Michael [mailto:Michael.Hodahkwen@va.gov]
**Sent:** Monday, July 17, 2017 12:54 PM
**To:** Sharon Winston
**Subject:** RE: Private message---Important Request

Sharon,

I wanted to follow up with your team about my previous email discussing the Nondisplacement clause.  I have been doing some additional research on this topic.  The workers under this contract are covered by the Service Contract Act and the Nondisplacement clause would normally apply; however, our contract with you is through the Ability One program which is specifically exempted from the Nondisplacement clause under FAR 22.1203-2.

Ability One vendors are not required to provide a seniority list under the nondisplacement clause and the workers would not be entitled to be offered the right of first refusal.  Will you be able to transition the workers to other contracts or would they be potentially terminated as a result of Project Hired not receiving the follow on contract?

Mike

Michael Hodahkwen
Contracting Officer
Department of Veterans Affairs
3230 Peacekeeper Way, Bldg 209
McClellan Park, CA 95652
Phone:  (916) 923-4567

**From:** Sharon Winston [mailto:sharonw@projecthired.org]
**Sent:** Monday, June 26, 2017 3:47 PM
**To:** Hodahkwen, Michael <Michael.Hodahkwen@va.gov>
**Cc:** Will J <willj@projecthired.org>; James Gargiulo <James@SpectrumSBA.com>; Carla Goulart <cgoulart@sourceamerica.org>
**Subject:** [EXTERNAL] FW: Private message---Important Request
**Importance:** High

Dear Mike

Hi, I have been able to notify Will Jordan, James Gargiulo and Carla Goulart of Source America about the contracts
going out to bid later this week or next.

I will not be informing the other two site supervisors until probably Friday this week---when I have done that I will let you know.

Thank you!

my best, Sharon

**From:** Hodahkwen, Michael [mailto:Michael.Hodahkwen@va.gov]
**Sent:** Friday, June 23, 2017 11:17 AM
**To:** Sharon Winston
**Subject:** RE: Private message---Important Request

Sharon,

The sources sought notice on FedBizOpps closed last Friday.  I received a response from several companies.  I performed a fairly extensive review of each company by reviewing the capability statement information they provided, plus reviewing any contracts they received in FPDS.  For the awards in FPDS, I reviewed the dollar amounts and NAICS codes of those contracts to see if they have performed under NAICS code 561421, *Telephone Answering Services* or any other closely related NAICS code.  I pushed back on vendors that didn't provide much information or if they didn't appear to have sufficient experience.

If we were able to locate at least two companies with sufficient experience, then we would be legally required to issue the RFQ as a Veteran set aside.  I received more than two companies that appear to have sufficient experience providing these or closely related services.  As a result, I must proceed with a Veteran set aside RFQ.

I understand that this is very disappointing news.  We both have been working towards a new five year contract and Project Hired has been providing these services for several years, so this is a major adjustment to make.

I don't want to give false hope, but there is still a small chance of this work staying with Project Hired.  It's true that we must consider Veteran companies before going to any other business type, but we are not required to pay exorbitant prices.  If the prices from the Veteran companies are too high to be considered fair and reasonable, then we would not proceed with an award to them.  We won't know this until the quotes are received and reviewed, but I wanted you to know about this possibility.

The workers under all three contracts will be offered the right of first refusal under the *non-displacement clause*.  This clause was put in place so that workers on a federal contract don't lose their jobs when the contract changes hands to a new vendor.  If you have other work available to the workers, they would not be in a position to lose their job and the non-displacement clause would be a moot point.  Do you have other work available for the workers at all three locations or will they need to be offered the right of first refusal?

Mike

Michael Hodahkwen
Contracting Officer
Department of Veterans Affairs
3230 Peacekeeper Way, Bldg 209
McClellan Park, CA 95652
Phone:  (916) 923-4567

**From:** Sharon Winston [mailto:sharonw@projecthired.org]
**Sent:** Saturday, June 17, 2017 2:55 PM
**To:** Hodahkwen, Michael <Michael.Hodahkwen@va.gov>
**Subject:** [EXTERNAL] Private message---Important Request
**Importance:** High

Dear Mike

Hi, hope this finds you  well.

I would like to request that when you have completed your research and determination of the contracts that you
communicate your decision to only me.

If the news is favorable, I will quickly inform the agency.  If it is not, I need to manage the communications streams
carefully and respectfully.

As you can appreciate, I  must inform the Board Chairman first.  The Project HIRED board knows of the necessity of the research and its possible implications.

Then, you and I should  talk about timing issues, so that when I inform the supervisors, staff, board and community partners (grantors and donors), I can share an impact timeline.

Please share your thoughts.

Thank you for your partnership.

my best, Sharon

**From:** Hodahkwen, Michael [mailto:Michael.Hodahkwen@va.gov]
**Sent:** Friday, June 09, 2017 10:59 AM
**To:** James Gargiulo; 'Sean Armstrong'; Sharon Winston
**Cc:** Will J
**Subject:** RE: [EXTERNAL] RE: VA261-17-C-0067, Switchboard, VAMC, San Francisco-Performed by Project Hired will expire on 9/30/17

James,

Thanks for providing the staffing numbers.  For what it's worth, I would like your team to know that I am scrutinizing the capabilities of vendors that have responded to my sources sought so far.  I will keep the company name anonymous, but I challenged the capabilities of a vendor earlier this morning.  They have only been awarded a couple government contracts that were very low dollar (below $25k).  I explained the general magnitude of this contract and how I didn't see any information that suggests they even remotely possess the capabilities to perform under this contract.  Hopefully that serves as some reassurance to you during this time that I will not take this contract out of the Ability One contract unless I have no other choice.

I will be in touch as more information is available from the market research.

Mike

**From:** James Gargiulo [mailto:James@SpectrumSBA.com]
**Sent:** Friday, June 09, 2017 10:49 AM
**To:** Hodahkwen, Michael; 'Sean Armstrong'; 'Sharon Winston'

4

**Cc:** "Will J"
**Subject:** [EXTERNAL] RE: VA261-17-C-0067, Switchboard, VAMC, San Francisco-Performed by Project Hired will expire on 9/30/17

Hi Mike,

Below is a chart that shows the positions accounted for in our contract both in terms of total employees and FTEs.  We've also listed the number of current positions filled.

|  | Positions Per Contract | FTEs Per Contract | Current Positions Filled |
|---|---|---|---|
| San Francisco | 9 | 7.6 | 7 |
| Palo Alto | 17 | 13.4 | 14 |
| Fresno | 9 | 7.8 | 10 |

We believe the number of contract positions/FTEs is the optimal staffing as it provides a good mix of full-time and part-time employees to cover the 24/7 shifts.  As part of the Ability One program, we hope that each employee is able to graduate into competitive employment elsewhere in the community.  As a result, we do have understaffing issues which causes us to recruit year-round for employees, and the remaining Operators and Site Supervisors work extra hours to help cover any short-term deficiencies in staffing.  You may notice that we've actually over-staffed Fresno in anticipation of the normal turnover and graduation.

Please let us know if you need any further information.

Regards,

**James Gargiulo**
P.O. Box 59327
San Jose, CA  95159-0327
(949) 351-1538
www.SpectrumSBA.com
www.Linkedin.com/in/JamesGargiulo



**From:** Hodahkwen, Michael [mailto:Michael.Hodahkwen@va.gov]
**Sent:** Friday, June 9, 2017 6:56 AM
**To:** Sean Armstrong <sarmstrong@sourceamerica.org>; Sharon Winston (sharonw@projecthired.org) <sharonw@projecthired.org>; James Gargiulo (James@SpectrumSBA.com) <James@SpectrumSBA.com>
**Cc:** 'Will J' (willj@projecthired.org) <willj@projecthired.org>
**Subject:** RE: VA261-17-C-0067, Switchboard, VAMC, San Francisco-Performed by Project Hired will expire on 9/30/17

Good morning,

As mentioned in my previous email, we will be performing market research to determine if the "rule of two" applies.  A major part of the market research effort is through a sources sought notice that was posted on FedBizOpps.  We posted a notice which can be seen at the following link:

https://www.fbo.gov/spg/VA/VANCHCS/VANCHCS/VA26117Q0662/listing.html

Our contract with Project Hired covers three locations with 24/7 service.  The combined contract is fairly substantial in magnitude and if a Veteran owned company believes they can provide these services they will need to be able to demonstrate performance of other contracts with a similar magnitude.  I'm letting you know this to hopefully ease some of your concerns because the vendors will be vetted before we decide to proceed outside of Ability One.

The PWS doesn't say how many operators are at each location and doesn't list estimated workloads at each location.  This information would be helpful for the new contract but it wasn't too problematic when we were going with Project Hired because the operators are already onsite performing successfully for the past several years.  In order to evaluate the capabilities of a new vendor, we would need to know how many operators are currently at each location to understand what kind of staffing capabilities are needed.

Please let me know the total number of operators at each location.  Like I said in my previous email, no decisions have been made yet and it's still possible that this contract could stay under Ability One.  I would appreciate any assistance you can provide as we work through the market research process.

Mike

Michael Hodahkwen
Contracting Officer
Department of Veterans Affairs
3230 Peacekeeper Way, Bldg 209
McClellan Park, CA 95652
Phone:  (916) 923-4567

**From:** Hodahkwen, Michael
**Sent:** Wednesday, June 07, 2017 11:53 AM
**To:** 'Sean Armstrong'
**Cc:** James Gargiulo (James@SpectrumSBA.com); Sharon Winston (sharonw@projecthired.org); 'Will J' (willj@projecthired.org)
**Subject:** RE: VA261-17-C-0067, Switchboard, VAMC, San Francisco-Performed by Project Hired will expire on 9/30/17

Sean,

Thanks for speaking with me a moment ago.  As we discussed, on 5/30 a major court case decision was published from the Court of Federal Claims under PDS Consultants v US.  In the case, a Veteran owned company challenged whether the law under the Veterans Benefits Act took precedence over the law for

6

Ability One.  The Court held that VBA takes precedence, so even for contracts already on the procurement list, the VA must still perform market research to see if two or more Veteran companies can provide the product/service.  If the "rule of two" it met, then by law the VA must set aside the procurement for Veterans.

This completely throws a monkey wrench into our plans for this contract and now I need to perform market research to see if the "rule of two" applies.  On the call I mentioned that if we are unable to satisfy the "rule of two", then we will still be able to proceed under Ability One.  I will keep your team in the loop throughout this process so you know what to expect.  I will start the market research this week so we can decide how to proceed on this contract.

I know that in this time of uncertainty it can be very unnerving.  Nothing has been finalized yet because we still need to see what happens in the market research.  Please feel free to call or email if you have any questions.

Mike

Michael Hodahkwen
Contracting Officer
Department of Veterans Affairs
3230 Peacekeeper Way, Bldg 209
McClellan Park, CA 95652
Phone:  (916) 923-4567

**From:** Sean Armstrong [mailto:sarmstrong@sourceamerica.org]
**Sent:** Wednesday, June 07, 2017 11:33 AM
**To:** Hodahkwen, Michael
**Subject:** [EXTERNAL] RE: VA261-17-C-0067, Switchboard, VAMC, San Francisco-Performed by Project Hired will expire on 9/30/17

Yes, I just returned to my office.

Should I call you?

**Sean Armstrong**
Senior Program Manager, Veterans Affairs Accounts
**SourceAmerica**
(o) (817)622-7034




**From:** Hodahkwen, Michael [mailto:Michael.Hodahkwen@va.gov]
**Sent:** Wednesday, June 07, 2017 1:32 PM
**To:** Sean Armstrong
**Subject:** RE: VA261-17-C-0067, Switchboard, VAMC, San Francisco-Performed by Project Hired will expire on 9/30/17

Are you available for a call?

Mike
916-923-4567

**From:** Sean Armstrong [mailto:sarmstrong@sourceamerica.org]
**Sent:** Wednesday, June 07, 2017 11:30 AM
**To:** Hodahkwen, Michael
**Cc:** James Gargiulo (James@SpectrumSBA.com); Sharon Winston (sharonw@projecthired.org); 'Will J' (willj@projecthired.org)
**Subject:** [EXTERNAL] RE: VA261-17-C-0067, Switchboard, VAMC, San Francisco-Performed by Project Hired will expire on 9/30/17

Hello Ms. Hodahkwen,

To follow-up, can you provide an anticipated release date for the solicitation, an updated SOW and the wage determination?

As you know, this contract will expire on 9/30/2017 and the aforementioned documentation is required to begin develop pricing and is required by the commission.

Please let me know if you have any questions.

Thank you,
Sean

**Sean Armstrong**
Senior Program Manager, Veterans Affairs Accounts
**SourceAmerica**
(o) (817)622-7034



**From:** Sean Armstrong
**Sent:** Monday, May 22, 2017 10:01 AM
**To:** michael.hodahkwen@va.gov
**Cc:** James Gargiulo (James@SpectrumSBA.com); Sharon Winston (sharonw@projecthired.org); 'Will J' (willj@projecthired.org)
**Subject:** VA261-17-C-0067, Switchboard, VAMC, San Francisco-Performed by Project Hired will expire on 9/30/17

Good morning Mr. Hodahkwen,

I hope you had a good weekend.

Contract VA261-17-C-0067 Switchboard Operations, performed by Project Hired at the VAMC in San Francisco, CA will expire on 9/30/17 and I wanted to follow-up with you regarding the anticipated release date for the new solicitation. Also, we need an updated Statement of Work and Wage Determination.

This documentation is crucial so the NPA can begin developing their pricing.  Further, it  is required by the Commission to ensure the Contracting Activity (CA) and Nonprofit Agency (NPA) have reached price concurrence.  Concurrence is documented on the Service Pricing Format (SPF) and must be signed by the CA, NPA and SourceAmerica.

Also, for your convenience I have attached the Pricing Memo #3 which outlines a timeline for us on page 21 in Appendix D Section 2.

Finally, as you know, next week we are 120 days from contract expiration, so we want to ensure the aforementioned timeline is followed.

Please let me know if you have any questions.

Regards,
Sean

This message has been scanned for malware by Websense. www.websense.com

Click here to report this email as spam.

# EXHIBIT B-2

**From:** "Blevins, Mark" <Mark.Blevins2@va.gov>
**Date:** June 6, 2019 at 10:25:54 AM EDT
**To:** "wtyler@phoenixhsv.org" <wtyler@phoenixhsv.org>
**Cc:** "Kemp, Neal" <Neal.Kemp@va.gov>, "Thrash, Julian (SAC)" <Julian.Thrash@va.gov>, "Christian, Maurice (SAC)" <Maurice.Christian@va.gov>, "Wilcox, Zachary (SAC)" <Zachary.Wilcox@va.gov>
**Subject: PLEASE Read  FLAGS  Department of Veteran Affairs**

Dear Mr. Wes Tyler

On May 20, 2019, VA issued a class deviation which changed applicable policy in order to comply with the Federal Circuit's decision, and subsequent mandate, issued in PDS Consultants v. United States, 907 F.3d 1345, 1358-60 (Fed. Cir. 2018).  As a result of this policy change, VA cannot issue any renewal letters at this time for the flag purchases.  However, VA will purchase those flags which fall under the purchase orders which had already been issued and are currently in effect in accordance with the monthly delivery schedule which ends on or about July 31, 2019.

I have attached a copy of your award for reference purposes.

Please contact me if you should have any questions.

Mark

The information in this message may contain information that is private, confidential and/or privileged under various laws or regulations. If you are not the intended recipient, be advised that review, disclosure or other use of this information is prohibited and we would request you forward the message to apatterson@phoenixhsv.org noting that you are NOT the intended recipient and then delete the message

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | BPA NO. | 1. CONTRACT ID CODE | | PAGE 1 | OF PAGES 2 |
|---|---|---|---|---|---|---|

| 2. AMENDMENT/MODIFICATION NUMBER P00003 | 3. EFFECTIVE DATE August 1, 2018 | 4. REQUISITION/PURCHASE REQ. NUMBER 796-18-4-1003-0023 | | 5. PROJECT NUMBER (if applicable) none |
|---|---|---|---|---|

| 6. ISSUED BY                          CODE   36C10G | 7. ADMINISTERED BY (If other than Item 6)          CODE   36C10G |
|---|---|
| U.S. Department of Veterans Affairs OPAL \| Strategic Acquisition Center<br><br>10300 Spotsylvania Ave \| STE 400 Fredericksburg VA 22408-2697 | U.S. Department of Veterans Affairs OPAL \| Strategic Acquisition Center<br><br>10300 Spotsylvania Ave \| STE 400 Fredericksburg VA 22408-2697 |

| 8. NAME AND ADDRESS OF CONTRACTOR (Number, street, county, State and ZIP Code) | (X) | 9A. AMENDMENT OF SOLICITATION NUMBER |
|---|---|---|
| HUNTSVILLE REHABILITATION FOUNDATION PHOENIX<br><br>2939 JOHNSON RD<br><br>HUNTSVILLE AL 35805 | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NUMBER VA119-15-C-0011 P00003 |
| | | 10B. DATED (SEE ITEM 13) |
| CODE    6H262                FACILITY CODE | | |

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or electronic communication which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by letter or electronic communication, provided each letter or electronic communication makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | | |
|---|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). | |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: | |
| | D. OTHER (Specify type of modification and authority) | |

E. IMPORTANT:   Contractor  ☐ is not,  ☒ is required to sign this document and return ____1____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

SEE THE CONTINUATION PAGE

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) David Perez — Chief Executive Officer | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) ZACHARY WILCOX CONTRACTING OFFICER |
|---|---|
| 15B. CONTRACTOR/OFFEROR _(signature)_ (Signature of person authorized to sign) | 15C. DATE SIGNED 5/22/18 | 16B. UNITED STATES OF AMERICA BY _____ (Signature of Contracting Officer) | 16C. DATE SIGNED |

PREVIOUS EDITION NOT USABLE

STANDARD FORM 30 (REV. 11/2016) Prescribed by GSA - FAR (48 CFR) 53.243

CONTINUATION PAGE VA119-15-C-0011 | P00003

1. The purpose of this modification is to exercise Option III and to update the delivery schedule for Option 3 and Option 4.

2. Section B.3, Delivery Schedule, for  Option Year 3 and Option Year 4 are hereby revised and incorporated as follows:

|          | Option 3 | Option 4 |
|----------|----------|----------|
| Month 1  | 6912     | 6912     |
| Month 2  | 6912     | 6912     |
| Month 3  | 6912     | 6912     |
| Month 4  | 6912     | 6912     |
| Month 5  | 6912     | 6912     |
| Month 6  | 6912     | 6912     |
| Month 7  | 6912     | 6912     |
| Month 8  | 6912     | 6912     |
| Month 9  | 6912     | 6912     |
| Month 10 | 6912     | 6912     |
| Month 11 | 6360     | 6360     |
| Month 12 | 0        | 0        |
|          | 75480    | 75480    |

3. Option III (August 1, 2018 – July 31, 2019), is hereby exercised under CLIN 3001, in the amount of $3,139,213.20.  The total amount obligated is changed from $9,582,161.28 to $12,721,374.48, an increase of $3,139,213.20.

4. Purchase Order (PO) number **796-U80004** will be used on all submitted invoices.

5. All other terms and conditions remain the same.

End of Modification

From: "Blevins, Mark" <Mark.Blevins2@va.gov>
Date: Jun 6, 2019 10:24
Subject: PLEASE Read FLAGS Department of Veteran Affairs
To: Robert Hutt <Robert@nbrs.org>
Cc: "Kemp, Neal" <Neal.Kemp@va.gov>,"Thrash, Julian (SAC)" <Julian.Thrash@va.gov>,"Christian, Maurice (SAC)" <Maurice.Christian@va.gov>,"Wilcox, Zachary (SAC)" <Zachary.Wilcox@va.gov>

Dear Mr. Robert Hutt,

On May 20, 2019, VA issued a class deviation which changed applicable policy in order to comply with the Federal Circuit's decision, and subsequent mandate, issued in PDS Consultants v. United States, 907 F.3d 1345, 1358-60 (Fed. Cir. 2018). As a result of this policy change, VA cannot issue any renewal letters at this time for the flag purchases. However, VA will purchase those flags which fall under the purchase orders which had already been issued and are currently in effect in accordance with the monthly delivery schedule which ends on or about July 31, 2019.

I have attached a copy of your award for reference purposes.

Please contact me if you should have any questions.

Thanks,

Mark


[cid:image001.png@01D503E4.C2D03730]


Please take a moment and ...

Internal Customer, please tell us how we're doing<https://nam01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.surveymonkey.com%2Fr%2FMK7PCHK&amp;data=02%7C01%7Cjdiaz%40sourceamerica.org%7C3d0e56593fc944e6348308d6ea92907c%7C7cd55b73e7ef4c989bba20ea620bd692%7C0%7C0%7C636954313099081759&amp;sdata=ACx2gQjLmipp%2FONLsy78zKpVRAlt6IQ%2BRt0B2FgRhIw%3D&amp;reserved=0>

Week of Pay Cycle

Monday

Tuesday

Wednesday

Thursday

Friday

1st Week

0700-1530

0700-1530

0700-1530

0700-1530*

0700-1530*

2nd Week

0700-1530

0700-1530

0700-1530*

0700-1530*

0700-1530*

*on site at the SAC-Fredericksburg, VA Office


Mark Blevins
Supervisory Contract Specialist /
Contracting Officer, Division Chief 7-C
Strategic Acquisition Center (SAC)
Office of Procurement, Acquisition and Logistics (OPAL) U.S. Department of Veterans Affairs (VA)
10300 Spotsylvania Ave, Suite 400
Fredericksburg, VA 22408
Phone: 540-735-3771 - Soft Phone
Phone: 202-400 - 5716 - iPhone
Email: Mark.Blevins2@VA.Gov<mailto:Mark.Blevins2@VA.Gov>
"For Internal VA Use Only - Working Draft, Pre-Decisional, Deliberative Document: This e-mail and any attachments are intended only for the use of the addressee(s) named herein and may contain privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please notify me via return e-mail or telephone (202) 664-4948, and permanently delete the original and any copy of any e-mail and any printout thereof."

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | BPA NO. | 1. CONTRACT ID CODE | PAGE 1 | OF PAGES 2 |
|---|---|---|---|---|

| 2. AMENDMENT/MODIFICATION NUMBER P00003 | 3. EFFECTIVE DATE 08-01-2018 | 4. REQUISITION/PURCHASE REQ. NUMBER 796-18-4-1003-0022 | 5. PROJECT NUMBER (if applicable) none |
|---|---|---|---|

| 6. ISSUED BY | CODE | 36C10G | 7. ADMINISTERED BY (If other than Item 6) | CODE | 36C10G |
|---|---|---|---|---|---|

U.S. Department of Veterans Affairs
OPAL | Strategic Acquisition Center

10300 Spotsylvania Ave | STE 400
Fredericksburg VA 22408-2697

U.S. Department of Veterans Affairs
OPAL | Strategic Acquisition Center

10300 Spotsylvania Ave | STE 400
Fredericksburg VA 22408-2697

| 8. NAME AND ADDRESS OF CONTRACTOR (Number, street, county, State and ZIP Code) | (X) | 9A. AMENDMENT OF SOLICITATION NUMBER |
|---|---|---|
| NORTH BAY REHABILITATION SERVICES, INC.<br>NORTH BAY INDUSTRIES<br><br>649 MARTIN AVE<br><br>ROHNERT PARK CA 94928 | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NUMBER<br>VA119-15-C-0012 P00003 |
| | | 10B. DATED (SEE ITEM 13) |

| CODE | 0GCJ5 | | FACILITY CODE | |
|---|---|---|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[ ] The above numbered solicitation is amended as set forth in Item 14.  The hour and date specified for receipt of Offers [ ] is extended, [ ] is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or electronic communication which includes a reference to the solicitation and amendment numbers.  FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER.  If by virtue of this amendment you desire to change an offer already submitted, such change may be made by letter or electronic communication, provided each letter or electronic communication makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA   (If required)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS,
## IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority)  THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:   FAR 52.217-9, Option to Extend the Term of the Contract |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT:   Contractor [ ] is not, [X] is required to sign this document and return _____ 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION   (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

SEE THE CONTINATION PAGE

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Robert Hutt, President/CEO | ZACHARY WILCOX<br>CONTRACTING OFFICER |
| 15B. CONTRACTOR/OFFEROR<br><br>(Signature of person authorized to sign) | 15C. DATE SIGNED<br>5/23/18 | 16B. UNITED STATES OF AMERICA<br><br>BY _____<br>(Signature of Contracting Officer) | 16C. DATE SIGNED |

PREVIOUS EDITION NOT USABLE

STANDARD FORM 30   (REV. 11/2016)
Prescribed by GSA - FAR (48 CFR) 53.243

CONTINUATION PAGE VA119-15-C-0012 | P00003

1.  The purpose of this modification is to exercise Option III and to update the delivery schedule for Option 3 and Option 4.

2.  Section B.3, Delivery Schedule, for Option Year 3 and Option Year 4 are hereby revised and incorporated as follows:

|          | Option 3 | Option 4 |
|----------|----------|----------|
| Month 1  | 6912     | 6912     |
| Month 2  | 6912     | 6912     |
| Month 3  | 6912     | 6912     |
| Month 4  | 6912     | 6912     |
| Month 5  | 6912     | 6912     |
| Month 6  | 6912     | 6912     |
| Month 7  | 6912     | 6912     |
| Month 8  | 6912     | 6912     |
| Month 9  | 6912     | 6912     |
| Month 10 | 6912     | 6912     |
| Month 11 | 6360     | 6360     |
| Month 12 | 0        | 0        |
|          | 75480    | 75480    |

3.  Option III (August 1, 2018 – July 31, 2019), is hereby exercised under CLIN 3001, in the amount of $3,139,213.20. The total amount obligated is changed from $9,582,161.28 to $12,721,374.48, an increase of $3,139,213.20.

4.  Purchase Order (PO) number **796-U80005** will be used on all submitted invoices.

5.  All other terms and conditions remain the same.

End of Modification

# 83--FLAGS

**Solicitation Number: 36C10G19Q0093**
Agency: Department of Veterans Affairs
Office: VA Strategic Acquisition Center
Location: VA Strategic Acquisition Center

**Response Date:**

June 3, 2019

36C10G-19-Q-0093

U.S. FLAGS

THIS IS A SSN ONLY to identify sources that can provide the required supply items to meet the needs as identified herein. Please see FAR 5.201(c), FAR 19.501(c), and FAR subpart 7.3 for general information. Interested sources shall indicate that they are capable of providing the required supply items and must provide:

(1) Full name and address of the firm;

(2) DUNs number;

(3) Size status (i.e., large business, small business, 8(a), HUBZone, service disabled veteran owned small business (SDVOSB));

(4) Self-verification of firm status, e.g., SB or SDVOSB, et cet.;

(5) Gross dollars in Federal Contracts for FY2017 and 2018 regardless if cash accounting or accrual accounting method of accounting is used; and,

(6) Whether or not their firm actually manufacturers U.S. Flags OR if they are a wholesaler or other outlet which sells but does not manufacture flags.

No other information is required at this time. DO NOT SUBMIT A NARRATIVE, PROPOSAL, BROCHURES OR ANY ADDITIONAL INFORMATION AT THIS TIME.

The information provided in this SSN is subject to change and is not binding on the Government. This SSN is issued solely for information and planning purposes it does not constitute a Request for Quote ( RFQ ) or a promise to issue an RFQ in the future. The U.S. Government will not pay for any information or administrative costs incurred in response to this SSN; all costs associated with responding to this SSN will be solely at the interested party s expense. If a solicitation is released, a decision will be made to issue the same competitively or sole sourced and whether or not there will be any set-asides. All responses are due no later than June 3, 2019, (Monday) by 12 noon EST. Vendors shall send their submissions to:

Mark Blevins at Mark.Blevins2@VA.Gov

Contracting Officer, Procurement Division 7-C

and

Maurice Christian at Maurice.Christian@VA.gov

Contract Specialist, Procurement Division 7-C

Strategic Acquisition Center (SAC)

Office of Procurement, Acquisition and Logistics (OPAL)

U.S. Department of Veterans Affairs (VA)

10300 Spotsylvania Ave, Suite 400

Fredericksburg, VA 22408

Description: North American Industry Classification System (NAICS) code 314999 All Other Miscellaneous Textile Product Mills / PSC 8345 Flags and Pennants

Background Information: The VA follows the Rule of Two analysis in accordance with Kingdomware Technologies, Inc. vs. United States, 579 U.S. Â (2016) and 38 U.S.C. Â§8127. Limitations on sub-contracting is governed by FAR 52.219-14 (DEV. 2019-o0003) 12/3/2018. The VA seeks an American manufacturer of U.S. flags in accordance with the attached specifications. The anticipatory quantities would be 500,000 flags per year and the optimal contract vehicle would be a base year with four 12-month option periods whereby a total of 2,500,000 flags would be procured with a surge CLIN for an additional 50,000 flags per year for the base year period and all four option periods. The anticipatory pricing arrangement between USG and contractor would be firm fixed price.

Questions: Questions regarding this SSN shall only be submitted in writing by e-mail; Telephone calls will NOT be accepted. Questions may not be responded to at the discretion of the Contracting Officer.

# EXHIBIT B-3

**From:** "Blevins, Mark" <Mark.Blevins2@va.gov>
**Date:** June 6, 2019 at 10:29:45 AM EDT
**To:** "mmarchioli@goodwillmiami.org" <mmarchioli@goodwillmiami.org>
**Cc:** "Kemp, Neal" <Neal.Kemp@va.gov>, "Thrash, Julian (SAC)" <Julian.Thrash@va.gov>, "Christian, Maurice (SAC)" <Maurice.Christian@va.gov>, "Wilcox, Zachary (SAC)" <Zachary.Wilcox@va.gov>
**Subject: PLEASE Read  FLAGS  Department of Veteran Affairs**

Dear Mr. Mark Marchioli,

On May 20, 2019, VA issued a class deviation which changed applicable policy in order to comply with the Federal Circuit's decision, and subsequent mandate, issued in PDS Consultants v. United States, 907 F.3d 1345, 1358-60 (Fed. Cir. 2018).  As a result of this policy change, VA cannot issue any renewal letters at this time for the flag purchases.  However, VA will purchase those flags which fall under the purchase orders which had already been issued and are currently in effect in accordance with the monthly delivery schedule which ends on or about January 31, 2020.

I have attached a copy of your award for reference purposes.

Please contact me if you should have any questions.

Mark

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | BPA NO. | 1. CONTRACT ID CODE | PAGE 1 | OF | PAGES 3 |
|---|---|---|---|---|---|---|

| 2. AMENDMENT/MODIFICATION NUMBER | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NUMBER | 5. PROJECT NUMBER (if applicable) |
|---|---|---|---|
| P00001 | 02-01-2019 | 796-19-2-1003-0019 | none |

| 6. ISSUED BY | CODE | 36C10G | 7. ADMINISTERED BY (If other than Item 6) | CODE | 36C10G |
|---|---|---|---|---|---|
| U.S. Department of Veterans Affairs<br>OPAL \| Strategic Acquisition Center<br><br>10300 Spotsylvania Ave \| STE 400<br>Fredericksburg VA 22408-2697 | | | U.S. Department of Veterans Affairs<br>OPAL \| Strategic Acquisition Center<br><br>10300 Spotsylvania Ave \| STE 400<br>Fredericksburg VA 22408-2697 | | |

| 8. NAME AND ADDRESS OF CONTRACTOR (Number, street, county, State and ZIP Code) | (X) | 9A. AMENDMENT OF SOLICITATION NUMBER |
|---|---|---|
| GOODWILL INDUSTRIES OF SOUTH FLORIDA, INC.<br><br>2121 NW 21ST ST<br><br>MIAMI FL 33142 | | |
| | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NUMBER<br>36C10G18C0048 |
| CODE 3Z771    FACILITY CODE | | 10B. DATED (SEE ITEM 13)<br>12-01-2017 |

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or electronic communication which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by letter or electronic communication, provided each letter or electronic communication makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| CHECK ONE | | |
|---|---|---|
| ☐ | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| ☐ | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). | |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: | FAR 52.217-9 Option to Extend the Term of the Contract |
| ☐ | D. OTHER (Specify type of modification and authority) | |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

SEE CONTINUATION PAGE//////////////

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Carlos Mauricio Hernandez    SVP | Zachary Wilcox<br>Supervisory Contract Specialist, C |
| 15B. CONTRACTOR/OFFEROR<br>(Signature of person authorized to sign) | 15C. DATE SIGNED<br>1/30/2019 | 16B. UNITED STATES OF AMERICA<br>(Signature of Contracting Officer) | 16C. DATE SIGNED<br>01/31/2019 |

| PREVIOUS EDITION NOT USABLE | STANDARD FORM 30 (REV. 11/2016)<br>Prescribed by GSA - FAR (48 CFR) 53.243 |
|---|---|

36C10G-18-C-0048 P00001

## CONTINUATION PAGE

1. The purpose of this modification is to:
   a. Exercise Option 1 (February 1, 2019 – January 31, 2020), in the amount of $3,139,213.20.
   b. Update the delivery schedule.
2. See the Price/Item Schedule:

| ITEM NUMBER | DESCRIPTION OF SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 1001 | Option Year One Interment Flags - see delivery schedule Contract Period: Option I POP Begin: 02-01-2019 POP End: 01-31-2020 PRINCIPAL NAICS CODE: 313310 - Textile and Fabric Finishing Mills PRODUCT/SERVICE CODE: 8345 – Flags and Pennants NATIONAL STOCK NUMBER: 8345-00-656-1432 | 75,480.00 | EA | $41.59 | $3,139,213.20 |
| | | | | GRAND TOTAL | $3,139,213.20 |

| ACRN | APPROPRIATION | REQUISITION NUMBER | AMOUNT |
|---|---|---|---|
| 1 | 796-36X4537-1003-611500 -2696 Inventory Held for Sale-0161281G3 | 796-19-2-1003-0009 | $3,139,213.20 |

3. The delivery schedule is shown below:

### Goodwill Delivery Schedule

| Month | Option Year 1-2 |
|---|---|
| Feb-19 | 6912 |
| Mar-19 | 6912 |
| Apr-19 | 6912 |
| May-19 | 6912 |
| Jun-19 | 6912 |
| Jul-19 | 6912 |
| Aug-19 | 6912 |
| Sep-19 | 6912 |
| Oct-19 | 6912 |
| Nov-19 | 6912 |
| Dec-19 | 6360 |
| Jan-20 | 0 |
| | 75480 |

36C10G-18-C-0048 P00001

4. The total amount obligated funding for Option Period 1 is $3,139,213.20.  Purchase Order (PO) number 796-U90999 will be used on all submitted invoices.
   *U90003 (handwritten)*

5. The total obligated Contract value is increased by $3,139,213.20, from $3,073,545.60 to $6,212,758.80.

6. All other terms and conditions remain the same.
   \\\\\\\\\\\\\\\\\\\\\\\\\\\END OF MODIFICATION////////////////////////

**From:** Stout, Kristine <[Kristine.Stout@va.gov](mailto:Kristine.Stout@va.gov)>
**Sent:** Tuesday, June 4, 2019 2:09 PM
**To:** Kathleen Hickey <[khickey@sourceamerica.org](mailto:khickey@sourceamerica.org)>
**Subject:** RE: Custodial Services, Department of Veterans Affairs Maryland Health Care System (VAMHCS), Baltimore, MD

Hello,

So as I was working to respond to this I found a new VA Deviation, which I now need to receive clarification on before I can answer (I am sorry it was effective 5/20 but I do not see where it was emailed to the employees). I knew a change was coming, but had not seen it (and had no idea when they were going to issue it)

**From:** Kathleen Hickey <[khickey@sourceamerica.org](mailto:khickey@sourceamerica.org)>
**Sent:** Tuesday, June 04, 2019 1:08 PM
**To:** Stout, Kristine <[Kristine.Stout@va.gov](mailto:Kristine.Stout@va.gov)>
**Subject:** [EXTERNAL] RE: Custodial Services, Department of Veterans Affairs Maryland Health Care System (VAMHCS), Baltimore, MD

Hi Kristine,

Thank you for all of your support on getting these questions answered. I do have one more and hopefully last request.

Can you confirm in writing based on the current ruling with the VA that this project is in fact coming back to the AbilityOne Program.

Thank you,
Kathleen

**Kathleen Hickey**
Senior Account Manager, Civilian Accounts
SourceAmerica
(o) 571-421-8747   (c) 571-422-7431



NOTICE: This Message (that includes any attachments) is for the exclusive and Confidential use of the intended recipient only. This Message may contain information that is privileged, confidential, proprietary, protected by work product or other rules, or generally exempt from disclosure. If you are not the intended recipient, please do not read, distribute, review, copy, disclose, or take any action in reliance on this Message. If you have received this Message in error, please notify me immediately and promptly delete this Message from your device(s). The contents of this Message are not intended and should not be taken as legal or tax advice. The sender does not waive attorney-client or work product privilege by the transmission of this Message. Neither this Notice, my typed signature block, nor anything else in this Message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this Message

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-01903

**BAYAUD ENTERPRISES, INC.**

    and

**SOURCEAMERICA**

        Plaintiffs,

    v.

**U.S. DEPARTMENT OF VETERANS
  AFFAIRS**

    and

**ROBERT WILKIE, IN HIS OFFICIAL
  CAPACITY AS SECRETARY OF
  VETERANS AFFAIRS**

    and

**UNITED STATES OF AMERICA**

        Defendants.

---

**DECLARATION OF DAVID HENNINGER IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTIVE RELIEF**

---

I, David Henninger, declare and state as follows:

1.    I am the Executive Director of Bayaud Enterprises, Inc. ("Bayaud"), a Plaintiff in

the above-captioned lawsuit.  I have been the Executive Director of Bayaud since 1973.  I submit

this affidavit in support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary

Injunctive Relief.  I have personal knowledge of the facts stated herein, and if called to testify, I could and would competently so testify.

2.      Bayaud is a nonprofit organization that employs and supports significantly disabled persons.  Bayaud is incorporated in Colorado, and its headquarters and principal place of business are located at 333 W. Bayaud Avenue, Denver, Colorado 80223.  Bayaud is a tax-exempt organization under Internal Revenue Code § 501(c)(3) and receives funding through U.S. Department of Education grants for community rehabilitation programs.

3.      Bayaud's mission is to "create **Hope, Opportunity and Choice,** with work as the means through which people with disabilities and other hurdles to employment can more fully participate in the mainstream of life."  *See*  (last visited May 30, 2019).  Bayaud primarily employs individuals with a mental health diagnosis or traumatic head injuries/other physical disabilities.

4.      Since 1969, Bayaud has served thousands of individuals with significant disabilities by providing them with living wages and benefits for full-time and part-time employment.  Bayaud provides its employees with jobs both within Bayaud and through contracts with collaborating partner agencies.  In its capacity as a U.S. AbilityOne Commission nonprofit agency represented by SourceAmerica, Bayaud regularly enters labor contracts with federal agencies.

5.      In order to maintain its status as an NPA, Bayaud must fill at least 75 percent of its overall direct labor hours for the fiscal year with employees who are significantly disabled and therefore not employable in the competitive labor market.  Bayaud maintains documentation for each employee demonstrating that he or she is significantly disabled and not competitively employable.

6.      In order to provide high-quality service to customers and remain competitive as a

2

nonprofit agency, Bayaud must ensure that its employees who are not competitively employable meet a competitive labor standard.  Bayaud does this by providing employees with individualized supportive services and accommodations above and beyond ADA requirements, such as employment training, assessment, coaching, placement, and supported employment.  *See* https://www.bayaudenterprises.org/about.  Employers in the marketplace generally do not provide these services to disabled employees, nor are they required to do so.

7.     For example, at the outset of any employment relationship, Bayaud performs an individualized intake assessment to determine both a suitable job or path and which supportive services the employee will require.  *See* https://www.bayaudenterprises.org/employment-services. Bayaud provides temporary supervised work experience and feedback for new employees who are not ready to enter the workforce, as well as Microsoft, Quickbooks, and customer service training. Furthermore, Bayaud reassesses employees' needs on a quarterly basis and provides ongoing support to help employees navigate on-the-job difficulties, benefits, and medical treatment.

8.     Because many of its employees can experience periods of episodic re-occurrence of symptoms that result in a need for treatment and recovery, Bayaud is specially equipped to respond to changes in the needs of its employees. For example, Bayaud trains site supervisors to identify the warning signs of relapse and to provide appropriate and immediate support. Additionally, if an employee requires time off for treatment, Bayaud maintains flexibility to immediately backfill the employee's position on a temporary basis and to allow the employee to return to his or her position upon recovery.

9.     Many of Bayaud's employees with significant disabilities have retained employment with Bayaud for significant periods of time.  For example, several current Bayaud

employees have worked for Bayaud for over 20 years. Without the specialized support Bayaud provides its employees, Bayaud's employees would be unable to retain competitive employment and would likely survive on government benefits instead.

10.     Bayaud holds several AbilityOne Procurement List designations that presently provide employment for numerous significantly disabled persons who cannot obtain competitive employment elsewhere, including three contracts with the VA, described below, that are at immediate risk if the VA is permitted to enforce the 2019 Class Deviation and its interpretation of the Rule of Two. These at-risk contracts provide employment for 42 significantly disabled Bayaud employees (including 12 service veterans who are significantly disabled).

11.     Contract No. 36C25918C0251 (SourceAmerica Project No. 071005) between Bayaud and VA Suboffice 259—Network Contracting Office ("NCO") 19 covers patient escort and medical transportation services for the eastern Colorado healthcare system in Denver. The contract has a one-year base period that expires on June 24, 2019, plus four 1-year option periods that run until June 24, 2023. The current base period began on June 25, 2018 and has a value of $1,138,679.05. The total contract value, if all options are extended, is approximately $5,693,395.25. The U.S. AbilityOne Commission added these services to the Procurement List in 2007, and Bayaud has been the mandatory source since that date. The contract currently provides a livelihood for 17 employees with significant disabilities, 8 of whom are service veterans with significant disabilities. Bayaud has received strong past performance ratings from the VA for its patient escort and medical transportation services.

12.     Contract No. 36C25918C0155 (SourceAmerica Project No. 071153) between Bayaud and VA Suboffice 259—NCO 19 covers mailroom operation and reproduction services in

Denver.  The contract contains a base period that runs from April 1, 2019 to September 30, 2019, plus three 6-month option periods that run until March 31, 2021.  The current base period expires on September 30, 2019, with a value of $272,673.18 during this base period.  The total contract value if all options are exercised is approximately $1,090,692.72.  The U.S. AbilityOne Commission added these services to the Procurement List in 1992, and Bayaud has been the mandatory source since that date.  The contract currently provides a livelihood for 10 employees with significant disabilities.  Bayaud has received strong past performance ratings from the VA for its mailroom operation and reproduction services.

13.     Contract No. 36C25918C0153 (SourceAmerica Project No. 70912) between Bayaud and VA Suboffice 259—Network Contracting Office ("NCO") 19 covers switchboard operation services for the eastern Colorado healthcare system in Denver and Colorado Springs. The contract has a 1-year base period that ran from April 1, 2018 to March 31, 2019, plus four 1-year option periods that run until March 31, 2023. The current option period began on April 1, 2019 and expires on March 31, 2020, with a contract value of $772,377.24 during this option period.  The total contract value, if all options are extended, is approximately $3,861,886.20.  The U.S. AbilityOne Commission added these services to the Procurement List in 1990, and Bayaud has been the mandatory source since that date.  The contract currently provides a livelihood for 15 employees with significant disabilities, 4 of whom are service veterans with significant disabilities. Bayaud has received strong past performance ratings from the VA.

14.     Before its 2019 Class Deviation, the VA advised Bayaud and SourceAmerica that, due to *PDS*, the VA had to conduct a "Rule of Two" analysis to the switchboard,

mailroom/reproduction, and patient escort and medical transportation contracts rather than exercising Bayaud's option, as the Procurement List required:

> How are you? I'm not sure if you are aware of the court ruling last month as it relates to the AbilityOne and Veterans First programs. As with all of our acquisitions, we have to first determine if there are two or more Service Disabled Veteran Owned Small Businesses / Veteran Owned Small Businesses (SDVOSB/VOSBs); often called the rule of two capable of performing the service. Prior to this latest ruling, the AbilityOne program was "exempt" for lack of a better term. I have attached the decision for your review. This will impact all of the contracts we have with Bayaud that are due to expire. As Mr. [Curtis] Jordan mentioned in his email of 8 June, this is a game changer for us.

A true and correct copy of the email from Pamela Barnes to various people dated June 27, 2017 at 6:26pm is attached as Ex. 1.

15.     The VA then extended and re-awarded these contracts to Bayaud pending the *PDS* appeal, in some cases with shorter base and option periods than the VA historically provided. In light of the 2019 Class Deviation, Bayaud expects that the VA will re-compete the Bayaud contracts as Rule of Two set-aside contracts, for which Bayaud will be unable to compete, upon the expiration of the current base or option periods.

16.     If the VA competes the Bayaud contracts under the Rule of Two, Bayaud will no longer be able to support the 42 significantly disabled people employed on these contracts, who will then be unable to secure and maintain competitive employment elsewhere. They are certified as significantly disabled and "not competitively employable." Loss of these contracts will thus eliminate their current means of livelihood.

17.     The loss of these contracts will also cause severe financial harm to Bayaud. These contracts provide substantial revenue to Bayaud, and losing these contracts will jeopardize Bayaud's ability to continue to provide certain support services. Indeed, several support staff and

17.     The loss of these contracts will also cause severe financial harm to Bayaud.  These contracts provide substantial revenue to Bayaud, and losing these contracts will jeopardize Bayaud's ability to continue to provide certain support services.  Indeed, several support staff and staff providing indirect labor on Bayaud's VA contracts will lose their jobs if the VA is permitted to enforce the 2019 Class Deviation and compete these contracts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 7th day of June, 2019, at Denver, Colorado.


Respectfully submitted,

David Henninger
Executive Director of Bayaud Enterprises, Inc.

7

# EXHIBIT C-1

| | |
|---|---|
| **From:** | Barnes, Pamela A. (SAO <Pamela.Barnes@va.gov> |
| **Sent:** | Tuesday, June 27, 2017 6:26 PM |
| **To:** | Carla Goulart; 'Dani Harris'; Zanotti, Steven D.; Houser-Hanfelder, Sallie A.; Jordan, Curtis M. (SAO); Pridgen, Joshua |
| **Cc:** | Sean Armstrong; 'David Henninger'; 'Chris O'Connor'; Sarah Patton |
| **Subject:** | RE: VA mailroom check in - BAYAUD CONTRACTS |
| **Attachments:** | PDS Consultants - Reported Decision (30 May 2017).pdf |

Hello Carla,

How are you? I'm not sure if you are aware of the court ruling last month as it relates to the AbilityOne and Veterans First programs. As with all of our acquisitions, we have to first determine if there are two or more Service Disabled Veteran Owned Small Businesses / Veteran Owned Small Businesses (SDVOSB/VOSBs); often called the rule of two capable of performing the service. Prior to this latest ruling, the AbilityOne program was "exempt" for lack of a better term. I have attached the decision for your review. This will impact all of the contracts we have with Bayaud that are due to expire. As Mr. Jordan mentioned in his email of 8 June, this is a game changer for us.

Please call me and we can discuss further.

Thank you.

*Pamela Barnes*
*Contracting Officer, Branch Chief Services I*

*Department of Veterans Affairs*
*SAO West, Network Contracting Office 19 (NCO 19)*
*Rocky Mountain Acquisition Center*
*4100 East Mississippi Avenue, Suite 900*
*Glendale, CO 80246*

*E-mail: Pamela.Barnes@va.gov*
*Telephone: 303-202-8228*
*Fax: 303-202-8410*
*Mobile: 720-666-4263*

*"With malice toward none, with charity for all, with firmness in the right as God gives us to see the right, let us strive on to finish the work we are in, to bind up the nation's wounds, **to care for him who shall have borne the battle and for his widow and his orphan,** to do all which may achieve and cherish a just and lasting peace among ourselves and with all nations."*
*-- President Abraham Lincoln*

*Mission - Lead the acquisition enterprise to contracting excellence*

*Vision - Reshape the acquisition function to support our customers through the effective and innovative use of contracting policy, procedures, and processes.*

*Goals –*

1

- *Recruit, develop, and retain a workforce agile and responsive to supporting our veterans.*
- *Oversee quality acquisition planning and contract execution through innovative, sound, and cost effective business solutions.*
- *Take care of our acquisition family.*

*Core Values - Integrity, Commitment, Advocacy, Respect, and Excellence (I CARE).*

*As our mission partners, please take a few moments and let us know how we did by completing the attached **SURVEY**.*

Click here for NCO 19 Partner SharePoint
Click here for NCO 19 Purchase Card SharePoint
Click here for NCO 19 Staff SharePoint

*Effective July 03, 2017 new contact information:*
*Telephone number: 303-712-5813*
*Fax number: 303-712-5800*
*Address: 6162 South Willow Drive, Suite 300*
*Greenwood Village, Colorado 80111*

**From:** Carla Goulart [mailto:cgoulart@sourceamerica.org]
**Sent:** Monday, June 26, 2017 5:48 PM
**To:** 'Dani Harris'; Barnes, Pamela A. (SAO; Zanotti, Steven D.; Houser-Hanfelder, Sallie A.; Jordan, Curtis M. (SAO); Pridgen, Joshua
**Cc:** Sean Armstrong; Carla Goulart; 'David Henninger'; 'Chris O'Connor'; Sarah Patton
**Subject:** [EXTERNAL] RE: VA mailroom check in

Hi Pamela,

We are checking in on the Mailroom Contract. As was mentioned below, we want to be responsive to the VA re: timing and also meet the Commission requirements. In order to do this, we will need to get started on the price proposal.

Could you please provide us with a date on when we'll receive the solicitation.

Thank you very much.

Sincerely,

**Carla Goulart**
Executive Director, San Francisco Field Office
**SourceAmerica**
(o) 925-543-5120  (c) 925-250-0247



**From:** Carla Goulart
**Sent:** Thursday, June 8, 2017 11:50 AM
**To:** Dani Harris <dani.harris@bayaudenterprises.org>; pamela.barnes@va.gov; steven.zanotti@va.gov; sallie.houser-hanfelder@va.gov; curtis.jordan2@va.gov; joshua.pridgen@va.gov

**Cc:** Sean Armstrong <sarmstrong@sourceamerica.org>; Sam Boit <sboit@sourceamerica.org>; David Henninger <david.henninger@bayaudenterprises.org>; Chris O'Connor <chris.oconnor@bayaudenterprises.org>; Sarah Patton <spatton@sourceamerica.org>
**Subject:** RE: VA mailroom check in

Hi Pamela,

We wanted to "check in" on the status of the SOW/Solicitation for the Mailroom.  We want to be ready to provide Veterans Affairs with the price proposal and also meet the AbilityOne Commission timelines.  SourceAmerica need to submit the agreed to price (between the VA and Bayaud) to the AbilityOne Commission for their review of the FMP prior to contract award, this means we need to submit the "package" to the AbilityOne Commission on or before Sept. 1, 2017.

We are happy to set-up a call with all parties to review the process and answer any questions.  Sometimes there are questions on the forms, etc,

We look forward to hearing from you and the next steps.

Sincerely,


**From:** Dani Harris [mailto:dani.harris@bayaudenterprises.org]
**Sent:** Thursday, May 25, 2017 10:26 AM
**To:** pamela.barnes@va.gov; steven.zanotti@va.gov; sallie.houser-hanfelder@va.gov; curtis.jordan2@va.gov; joshua.pridgen@va.gov
**Cc:** Carla Goulart; Sean Armstrong; Sam Boit; David Henninger; Chris O'Connor
**Subject:** VA mailroom check in

Hello Pamela,

I wanted to check in with you regarding the VA Mailroom contract.  I am hearing from our Point of Contact, Steve Zanotti, that the VA may be moving to a "hybrid" mailroom operation in which Bayaud would remain at the Clermont site managing the mailroom operations, but that the new VA Hospital location would be taking those operations in house.  I am hoping to confirm with you whether or not this is the future direction and if so, inquire as to the reason the mailroom operations will be taken in house.

As you know, Source America had sent a 240 day notice requesting to begin the contract negotiation process in February, but you were still awaiting the SOW.  It is my understanding that the SOW has been completed and submitted.  I have included what I believe to be the appropriate parties to begin the dialogue around the upcoming contract, changes, and timeline in order to better assist in moving forward with a pricing package.


Thank you,


*Dani Harris*
Director of Federal Contracts
Bayaud Enterprises, Inc.
333 W. Bayaud Ave.   Denver, CO 80223
Phone: 303/830-6885 Ext. 254  Fax: 303/830-6653
www.bayaudenterprises.org

Click here to report this email as spam.

NOTICE: This Message (that includes any attachments) is for the exclusive and Confidential use of the intended recipient only. This Message may contain information that is privileged, confidential, proprietary, protected by work product or other rules, or generally exempt from disclosure. If you are not the intended recipient, please do not read, distribute, review, copy, disclose, or take any action in reliance on this Message. If you have received this Message in error, please notify me immediately and promptly delete this Message from your device(s). The contents of this Message are not intended and should not be taken as legal or tax advice. The sender does not waive attorney-client or work product privilege by the transmission of this Message. Neither this Notice, my typed signature block, nor anything else in this Message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this Message.

This message has been scanned for malware by Websense. www.websense.com

# In the United States Court of Federal Claims

No. 16-1063C
(Filed: May 30, 2017)*
**\*Opinion originally filed under seal on May 12, 2017**

| | |
|---|---|
| PDS CONSULTANTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>WINSTON-SALEM INDUSTRIES FOR THE BLIND,<br><br>Defendant-Intervenor. | Bid Protest; Veterans Benefit Act of 2006, 38 U.S.C. § 8127(a); Javits-Wagner-O'Day Act, 41 U.S.C. § 8501-06; Contracting Priority; *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969 (2016); AbilityOne Program |

*David S. Gallacher*, Washington, DC, for plaintiff. *Emily S. Theriault*, Washington, DC, of counsel.

*Jeffrey M. Lowry*, Civil Division, United States Department of Justice, Washington, DC, with whom were *Chad A. Readler*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant. *Harold W. Askins III*, Staff Attorney, Department of Veterans Affairs, of counsel. *Timi N. Kenealy*, General Counsel, and *John Konst*, Assistant General Counsel, Committee for Purchase from People who are Blind or Severely Disabled, of counsel.

*James K. Kearney*, Tysons Corner, VA, for defedant-intervenor. *Gary H. Nunes* and *Joshua L. Rodman*, Tysons Corner, VA, of counsel.

*Tracye Winfrey Howard*, Washington, DC, for National Industries for the Blind, *Amicus Curiae*.

## OPINION

FIRESTONE, *Senior Judge*.

This bid protest concerns the construction of two statutes: the Veterans Benefits Act of 2006 ("VBA"), 38 U.S.C. § 8127(a), and the Javits-Wagner-O'Day Act, 41 U.S.C. § 8501-06 ("JWOD"). The VBA requires the Department of Veteran's Affairs ("VA") to set goals for providing contracts to veteran-owned small businesses, and with exceptions not relevant here, mandates that before procuring goods and services the VA first determine whether there are at least two veteran-owned small businesses capable of performing the work. If so, the VA must limit competition to veteran-owned small businesses.[1] This process is known as a "Rule of Two" analysis. The JWOD requires government agencies, including but not limited to the VA, to purchase products and services from designated non-profits that employ blind and otherwise severely disabled people when those products or services appear on a list known as the "AbilityOne List" or "List." The entity responsible for placing goods and services on the List is known as

---

[1] The priority system is set forth in 38 U.S.C. § 8127(i). It establishes a first priority for small businesses owned and controlled by veterans with service-connected disabilities. In this opinion both preferences are labeled as a priority for small business owned and controlled by veterans:

> Priority for contracting preferences.—Preferences for awarding contracts to small business concerns shall be applied in the following order of priority:
> (1) Contracts awarded pursuant to subsection (b), (c), or (d) to small business concerns owned and controlled by veterans with service-connected disabilities.
> (2) Contract awarded pursuant to subsection (b), (c), or (d) to small business concerns owned and controlled by veterans that are not covered by paragraph (1).
> (3) Contracts awarded pursuant to —
> (A) section 8(a) of the Small Business Act (15 U.S.C. 637(a)); or
> (B) section 31 of such Act (15 U.S.C. 657a).
> (4) Contracts awarded pursuant to any other small business contracting preference.

38 U.S.C. § 8127(i).

the "AbilityOne Commission." The question before the court in this case is which procurement priority must the VA first employ: the requirement that the VA conduct a Rule of Two analysis to determine whether it must restrict the procurement to veteran-owned small businesses under the VBA or the requirement that the VA use the AbilityOne List under the JWOD, regardless of whether the VA has conducted a VBA Rule of Two analysis.

The VA, faced with these potentially contradictory contracting preferences, originally took the position in this litigation that if a product or service appears on the AbilityOne List for a particular region of the country the JWOD requires the VA to purchase that product off of the List without first performing a Rule of Two analysis. However, during the pendency of the litigation, the VA changed its position through regulation.[2] The VA now agrees that if a product or service was added to the AbilityOne List after 2010, the VA will perform the Rule of Two analysis before purchasing off of the List. The new regulation provides, however, that the VA will continue to purchase items off of the AbilityOne List without first performing a Rule of Two analysis for items added to the List before 2010. Plaintiff, PDS Consultants, Inc. ("PDS"), is a service-disabled veteran-owned small business that provides eyewear and other vision-related products to the VA under a number of contracts corresponding to different regions of the country. PDS argues that under the Supreme Court's recent decision in *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969 (2016), the VA is required to perform

---

[2] *See* Veterans Administration Regulation 808.002 issued March 6, 2017.

3

a Rule of Two analysis for all procurements, regardless of when the item was listed on the AbilityOne List.[3]

The government, defendant-intervenor, Winston-Salem Industries for the Blind ("IFB") and *amicus curiae*, National Industries for the Blind ("NIB")[4] (collectively, "the defendants") argue that the JWOD trumps the VA's VBA obligations if the product or service was added to the AbilityOne List before 2010, when the VA implemented the VBA priority system. In effect, the defendants argue that for products and services in the VA regions that were added to the List before 2010 the VA is permanently exempt from having to perform the Rule of Two analysis.[5]

For the reasons that follow, the court finds that the VA is required to perform a Rule of Two analysis for all procurements after the VBA was passed. Accordingly, the VA may not enter into future contracts with IFB until it performs a Rule of Two analysis and determines whether two or more veteran-owned small-businesses can perform the subject work.

---

[3] As discussed below, PDS initially challenged the validity of all existing contracts with IFB that the VA had entered into without performing a Rule of Two analysis. Following the government's change in its regulations, PDS now appears to be challenging only "new contracting determinations," Pl.'s Supp. Brief 3, including renewing or extending existing contracts, for the contracting regions in which the VA maintains that it need not perform a Rule of Two analysis before renewing or issuing a new contract to organizations on the AbilityOne List.

[4] NIB is the non-profit agency designated to represent non-profit agencies for the blind before the AbilityOne Commission. As such, NIB determines the suitability of products or services for the AbilityOne List and recommends fair market prices for items on the list.

[5] The VBA was passed in 2006. However, as discussed below, the VA's implementing regulations were issued in 2010.

## I.     BACKGROUND

### A.     The AbilityOne Program

The JWOD, initially passed in 1938 and as amended in 1971, requires federal

agencies to procure products and services from qualified non-profit agencies that employ

people who are blind or otherwise severely disabled under a program known as

"AbilityOne." 41 U.S.C. § 8501-06. To that end, the JWOD requires AbilityOne, acting

through the presidentially-appointed AbilityOne Commission ("Commission"), to

establish and maintain a procurement list ("AbilityOne List" or "List") of "suitable"

products and services produced by non-profits that AbilityOne has qualified as a non-

profit organization for the blind or severely disabled. *Id.* at § 8503(a). After AbilityOne

adds a product or service to the List using the Administrative Procedures Act's ("APA")

notice and comment procedures, *id.* at § 8503(a)(2), the JWOD states "[a]n entity of the

Federal Government intending to procure a product or service on the procurement list . . .

shall procure the product or service" from a qualified non-profit agency for the blind or

severely disabled. 41 U.S.C. § 8504. In other words, once an item is added to the

AbilityOne List, the JWOD requires federal agencies to purchase that product from the

designated non-profit. According to *amicus* NIB, the VA accounts for approximately

15.1% of the AbilityOne sales to government agencies in 2015, and "provided jobs for

approximately 630 blind or visually impaired individuals, many of whom are veterans."

NIB Brief at 1.

While the AbilityOne Commission has final authority for adding products and

services to the List, it has historically worked with agencies, including the VA, when

determining what items should be added to the List. 41 U.S.C. § 8503(d) (giving the Commission authority to add items to the procurement list); Administrative Record ("AR") 708 ("Although the Javits-Wagner O'Day Act gives the Commission statutory authority to determine which products or services are suitable to be added to the [AbilityOne List], the Commission strives to accomplish its mission of creating employment through cooperation and collaboration between the Commission and other federal agencies.").

Prior to the passage of the VBA in 2006, AbilityOne added eyewear and eyewear prescription services provided by defendant-intervenor IFB, a qualified non-profit, to the List for specific regions, referred to as Veterans Integrated Service Network ("VISNs"). The eyewear and eyewear prescription services were added with the VA's concurrence and participation. Working in coordination with the VA, AbilityOne added to the List eyewear prescription services for VISN 7 in 2002, and added VISN 2 in 2005. Once on the List the VA entered into contracts with IFB "to produce and provide prescription eyeglasses and associated services to eligible veteran beneficiaries serviced by VA Medical Centers and all affiliated out-patient clinics . . . . The eyeglasses will be made to the individual veteran's prescription." AR 275.

**B.    The Veterans Benefit Act**

Congress passed the current version of the VBA on December 22, 2006, PL 109–461, December 22, 2006, 120 Stat. 3403. The purpose of the VBA was to "increase contracting opportunities for small business concerns owned and controlled by veterans and small business concerns owned and controlled by veterans with service-connected

6

disabilities." 38 U.S.C. § 8127(a).  To that end, the VA is required to set specific annual goals for VA contracts to be awarded to veteran-owned small businesses and service-disabled veteran-owned small businesses.  *Id.* at § 8127(a)(1).  Further, the VBA included the "Rule of Two," which restricts competition for contracts to veteran-owned small businesses and service-disabled veteran-owned small businesses in cases where the contracting officer "has a reasonable expectation that two or more small business concerns owned and controlled by veterans will submit offers and that the award can be made at a fair and reasonable price that offers best value to the United States."  *Id.* at § 8127(d).  Unlike the JWOD which applies across government agencies, the VBA applies only to services and supplies procured by the VA.  *See* 48 C.F.R. § 819.7002; *Angelica Textile Servs., Inc. v. United States*, 95 Fed. Cl. 208, 222 (2010).

### C.   The VA's Attempts to Integrate their Obligations under the JWOD with their Obligations under the VBA

#### 1.   The 2010 Guidelines

In 2010, the VA issued its initial guidelines addressing the potential conflict between the VBA and the JWOD.  As this court explained in *Angelica Textile*, 95 Fed. Cl. at 213-214, the VA's guidelines stated that the agency would give first priority to all items already on the AbilityOne List.  However, the VA determined that before working with AbilityOne to add any new items to the AbilityOne List, the VA's contracting officer ("CO") would first perform a Rule of Two analysis to determine whether qualifying veteran-owned small businesses were able to perform the procurement.  *Id.*

7

Case 1:17-cv-01903-MSK-KLM  Document 40  Filed 06/07/19  USDC Colorado  Page 115 of
132
Case 1:16-cv-01063-NBF  Document 80  Filed 05/30/17  Page 8 of 25

In *Angelica Textile*, the court found that the VA contracting officer did not follow
the VA's guidelines when laundry services formerly performed by a veteran-owned small
business were added to the AbilityOne List without the VA performing a Rule of Two
analysis first. *Id.* at 214.[6]  The court found that the question of whether the VA's failure
to follow its guidelines was arbitrary, capricious, or not in conformity with the law turned
on "the relationship between the [VBA] and [JWOD], and the degree of deference the
court owes to the [VA]'s New Guidelines." *Id.* at 220.  The court found that the VA's
guidelines did not have the force of law, but were nevertheless entitled to *Skidmore*
deference. *Id.* at 221-22.  In finding that the VA's decision to give veteran-owned small
businesses priority when adding items to the List was reasonable, the court noted that it is
"a general maxim of statutory interpretation that a specific statute of specific intention
takes precedence over a general statute, particularly when the specific statute was later
enacted." *Id.* at 222 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384-85,
(1992); *NISH v. Rumsfeld*, 348 F.3d 1263, 1272 (10th Cir. 2003); *NISH v. Cohen*, 247
F.3d 197, 205 (4th Cir. 2001)).  The court found that "[w]here there is a conflict between
the two statutes, the more specific Veterans Benefits Act would control." *Id.*  The court
found, however, that though the statutes were in "tension," they were not "in direct
conflict" with each other. *Id.*

---

[6] The government argued that the CO's actions were not arbitrary and capricious because the
guidelines did not go into effect until after the CO began the procurement process. *Id.* at 220.
The court rejected this argument because the guidelines explicitly stated that they were to go into
effect immediately. *Id.*

Under those circumstances, the court found the VA's "action in giving first priority to [veteran-owned small businesses] is justified in light of the terms of the [VBA]." *Id.* Accordingly, the court concluded that that the CO's actions in assisting AbilityOne in adding the laundry services to the List before following the guidelines' instruction to first perform a Rule of Two analysis "lacked a rational basis and were arbitrary and capricious." *Id.* Therefore, the court held that "the laundry services listing shall be elided from the AbilityOne List without prejudice against future placement." *Id.* at 223.

Following the VA 2010 guidance documents and the *Angelica Textiles* decision, AbilityOne "ended cooperation and collaboration between the AbilityOne Program staff and VA contracting officers regarding PL additions." AR 708. Thereafter, AbilityOne began to add items unilaterally. AbilityOne took the position that because the VBA only applied to the VA, and not to AbilityOne, therefore AbilityOne was not required to perform the Rule of Two analysis before adding items to the List. *Id.* Rather, AbilityOne contends it has a statutory mandate to continue to add items to the List. *Id.* Because the VA could no longer participate in List additions without first performing a Rule of Two analysis, the AbilityOne Commission determined that the VA "has effectively made unilateral decisions by the Commission the only means to accomplish its statutory obligations when making additions to the PL for VA optical products and/or dispensary services." *Id.*

In 2013, 2014, and 2015, AbilityOne added and expanded the List for parts of

VISN 8, again leading to a contract between IFB and the VA. Def.'s MJAR 6 (citing AR

Tabs 24, 25, 28, and 10).

### 2. The *Kingdomware* Decision and the VA's July 2016 Policy Memorandum

The scope of the VA's VBA responsibilities was recently addressed by the

Supreme Court in *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969,

1977 (2016). At issue in that case was the VA's position that if the VA was meeting its

annual goals for contracts with veteran-owned small businesses as required by law, the

VA had the discretion to issue contract awards under the Federal Supply Schedule

("FSS") (a list of certain products and services that government agencies can quickly

acquire without having to go through the ordinary procurement process) without

performing a Rule of Two analysis. *See* 74 Fed. Reg. 64624 (2009). Kingdomware

Technologies, Inc., a veteran-owned small business, challenged the VA's interpretation

of the VBA, and on June 16, 2016, the Supreme Court issued a unanimous decision

finding that the VBA's Rule of Two was mandatory for the procurement of all VA goods

and services and not, as the VA argued, discretionary if the VA was meeting its VBA

contracting goals.

In rejecting the government's argument that the VA could purchase items from the

FSS without performing a Rule of Two analysis, the Court explained that the text of §

8127 "requires the Department to apply the Rule of Two to all contracting determinations

and to award contracts to veteran-owned small businesses." *Id.* at 1975. The Court noted

that the VBA stated that the contracting officer "shall award contracts" using restricted

competition except for certain enumerated exceptions, and found that the use of the word

"shall" "demonstrates that § 8127(d) mandates the use of the Rule of Two in *all*

contracting before using competitive procedures." *Id* at 1977 (emphasis added) (citing 38

U.S.C. § 8127(d)).  The court found that "[e]xcept when the Department uses the

noncompetitive and sole-source contracting procedures in subsections (b) and (c), §

8127(d) requires the Department to use the Rule of Two before awarding a contract to

another supplier.  The text also has no exceptions for orders from the FSS system." *Id*. at

1977.

On response to the *Kingdomware* decision, the VA issued a policy memorandum,

dated July 25, 2016, attempting to reconcile the requirements of the VBA and the JWOD.

AR 656-701.  The memorandum stated that the VA had a "continuing requirement to

comply with all statutory mandates," including an obligation to purchase items listed on

the AbilityOne List.  *Id*. at 666.  A decision tree attached to the memorandum provided

that if there was a mandatory source, including items on the AbilityOne List, then the

Rule of Two "does not apply." *Id*. at 701.  However, the VA continued to take the

position that before a contracting officer could propose an addition to the AbilityOne

List, the contracting officer was required to "conduct market research" and "apply the

VA Rule of Two" as required under the VBA.  *Id*. at 678.

On February 12, 2016, AbilityOne issued a notice in the Federal Register

proposing the addition of eyewear for all the VA's requirements in VISN 6 to the

AbilityOne List.  AR 758-59 (81 Fed. Reg. 7510-11).  After the Supreme Court issued its

decision in *Kingdomware*, PDS wrote a letter to the AbilityOne Commission stating that

many of the eyewear products and services that AbilityOne had proposed adding to the

List "are the same or similar to the types of eyeglasses many veteran-owned and service-

disabled veteran-owned businesses currently provide" to the VA.  AR 702.  PDS asserted

that adding VISN 6 to the List would cause the VA to violate § 8127 of the VBA,

because *Kingdomware* found that the Rule of Two was mandatory and Congress intended

it to cover "*all* VA procurements, including items already on the AbilityOne Procurement

List."  *Id.* at 703.  On July 19, 2016, PDS wrote the Commission another letter

encouraging it to "work with the VA to ensure that the [VA] performs the necessary

market research to determine whether the Rule of Two can be satisfied for VISN 6"

before adding that VISN to the List.  *Id.* at 704.

On August 1, 2016, the AbilityOne Commission voted to add eyewear for VISN 6

to the List.  *Id.* at 727.  In the notice published in the Federal Register, AbilityOne

addressed PDS's comments, noting that while the AbilityOne Commission appreciated

that it may be possible to purchase eyewear from veteran-owned small businesses:

> [T]he Commission's mission and duty is to provide employment
> opportunites for people who are blind or have significant disabilities, many
> of whom are veterans . . . . Adding the proposed products to the
> Commission's Procurement List will provide employment opportunities to
> a portion of the U.S. population that has a historically high rate of
> unemployment or underemployment, and is consistent with the
> Commission's authority established by 41 U.S.C. Chapter 85.

*Id.* at 761-62 (81 Fed. Reg. 51864).

### 3. Status of Current Contracts and the 2017 Changes to Interim Regulations

According to the Administrative Record, the VISN 2 contract to IFB was last extended August 30, 2016. AR Tab 2 at AR 75 (stating that the subject contract is extended for five months, ending January 31, 2017). At oral argument, the government stated that there is a sole-source contract extension in place that expires on September 30, 2017. Oral Argument Tr. 81:15-23. The current VISN 7 contract with IFB was awarded July 15, 2016, and is a "five year BPA to be reviewed annually and updated at that time." AR 282, Oral Argument Tr. 82:1-4. This contract expires on July 14, 2021. Oral Argument Tr. 82:4.

VISN 6 was added more recently to the AbilityOne List and thus there is no current contract with an AbilityOne contractor. There is a current contract in place with a service-disabled veteran-owned small business in VISN 8. Oral Argument Trans. 83:8-10. In VISN 8, the VA's contract with an AbilityOne contractor expires in May of 2017. Oral Argument Trans. 83:8-10.

On February 13, 2017, two days before oral argument was scheduled on the parties' cross-motions for judgment on the Administrative Record in this case, the government filed a notice of proposed changes in the VA's guidelines that would require VA procurement officials to apply the Rule of Two before procuring an item from the AbilityOne List if that item was added to the List on or after January 7, 2010 (the date the VA issued its initial regulations implementing the VBA) if the Rule of Two analysis was not performed before the item was added to the List. ECF No. 67. On March 6, 2017,

13

the government filed a notice that it had issued a final amendment to its guidelines,

codified in Veterans Administration Acquisition Regulation 808.002, with the

requirements outlined above. In light of the government's change in position, the court

asked the parties to submit supplemental briefing explaining what issues still remained to

be decided in the pending case. Supplemental briefing was concluded on March 20,

2017.

The government, plaintiff, and defendant-intervenor all agree that in light of the

new regulations, the plaintiff's challenges to the addition of VISN 6 and VISN 8, which

were added to the List after January 10, 2010, are now moot because the VA has agreed

to perform a Rule of Two analysis before entering into a contract with a vendor on the

List.[7]

With respect to VISN 2 and VISN 7, the plaintiff states that the issue still before

the court is "[w]hether the VA must apply the Rule of Two prior to making new

contracting determinations, including contract awards . . . ." Pl.'s Supp. Brief (ECF No.

71) at 2. The court understands from this that PDS is no longer challenging existing

contracts in VISN 2 and VISN 7. Instead, PDS is challenging the VA's position that it

---

[7] The plaintiff argues that because the VA did not use notice-and-comment rulemaking, and because there appear to be errors in the new guidance, the VA will have to revise the guidance again. Accordingly, plaintiff argues, the VA could amend or revoke the new guidance at any time "making the issues raised in this case ones that could easily recur and that are not completely mooted by the corrective action." Pl.'s Supp. Brief 3. In light of the court's ruling discussed below—that the VA is required to apply the Rule of Two before entering into a contract for items on the List and not previously subject to a Rule of Two analysis—the court rejects the plaintiff's request for an injunction expressly barring the VA from deviating from the regulation presented to the court with regard to post-2010 AbilityOne items that the VA can change its practice in such a manner.

Case 1:17-cv-01903-MSK-KLM   Document 40   Filed 06/07/19   USDC Colorado   Page 122 of
132
Case 1:16-cv-01063-NBF   Document 80   Filed 05/30/17   Page 15 of 25

may issue new contracts in VISN 2 and VISN 7 without first performing a Rule of Two

analysis after the existing contracts expire. Accordingly, the only issue that remains

before the court is whether the VA may issue additional contracts for VISN 2 and VISN 7

(which were both added to the List prior to the passage of the VBA) to vendors on the

List before performing a Rule of Two analysis. [8]

## II.    STANDARDS OF REVIEW

The government has moved to dismiss this case for lack of jurisdiction under Rule

of the Court of Federal Claims ("RCFC") 12(b)(1) and the parties have cross-moved for

judgment on the administrative record under RCFC 52.1.

The Tucker Act provides this court with jurisdiction to hear bid protests alleging

"violation of a statute or regulation in connection with a procurement or a proposed

procurement." 28 U.S.C. § 1491(b)(1). As the Federal Circuit has explained, the court's

bid protest jurisdiction is "very sweeping in scope." *RAMCOR Servs. Group v. United

States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). A procurement or proposed procurement

for the purposes of the Tucker Act "includes all stages of the process of acquiring

property or services, beginning with the process for determining a need for property or

services and ending with contract completion and closeout." *Distributed Solutions, Inc.

v. United States*, 539 F.3d 1340, 1345-46 (Fed. Cir. 2008). In considering a motion to

---

[8] PDS states in its supplemental brief that the question of whether the AbilityOne Commission
can unilaterally add products and services to the List without VA input is also an issue before
this court. This issue was discussed at oral argument, but was not addressed in any of the
parties' cross-motions for judgment on the administrative record. Because the plaintiff did not
challenge AbilityOne's authority in its initial briefing, and because this issue was affected by the
government's change in its guidance letter, the court finds that this issue is not properly before
the court.

dismiss for lack of jurisdiction, "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Acevedo v. United States*, 824 F.3d 1365, 1368 (quoting *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)).

The APA, 5 U.S.C. § 706(2)(A), provides the applicable standard of review for a bid protest. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-1058 (Fed. Cir. 2000). Accordingly, the court's review is limited to determining whether an agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 1057. In this case, the plaintiffs are only alleging a violation of the law. Under the Supreme Court's decision in *Chevron, U.S.C. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), when reviewing a challenge to an agency's interpretation of a statue, a court must first determine whether the statute is ambiguous. If Congress's intent is unambiguous, the court must "give effect to the unambiguously expressed intent of Congress" and end the inquiry. *Chevron*, 467 U.S. at 842. In determining whether the statue is ambiguous, the court "employ[s] traditional tools of statutory construction and examine 'the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'" *Kyocera Solar, Inc. v. United States Int'l Trade Comm'n*, 844 F.3d 1334, 1338 (Fed. Cir. 2016) (quoting *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012)). If the statute is "silent or ambiguous," then the court must determine "whether the agency provided 'a permissible construction of the statute.'" *Fitzgerald v. Dep't of Homeland Security*, 837 F.3d 1346, 1353 (Fed. Cir. 2016) (quoting *Chevron*, 467 U.S. at 843).

III.   **DISCUSSION**

A.   The Court has Jurisdiction over PDS's Complaint

Before reaching the merits of the parties' arguments regarding the proper

construction of the VBA and the JWOD, the court will address the government's

argument that this court lacks jurisdiction over this case. *See Ultramercial, Inc. v. Hulu,*

*LLC,* 772 F.3d 709, 718 (Fed. Cir. 2014) (noting that "a court must assure itself of its

own jurisdiction before resolving the merits of a dispute . . ." (citing *Diggs v. Dep't of*

*Hous. & Urban Dev.,* 670 F.3d 1353, 1355 (Fed. Cir. 2011)). For the reasons stated

below, the court finds that none of the government's objections deprive this court of

jurisdiction over PDS's protest.

In its initial briefing, PDS challenged both existing contracts between the VA and

IFB and the addition of VISNs to the List when the VA had not first performed a Rule of

Two analysis. For the first time at oral argument, the government argued that PDS was

required to challenge additions to the List as an APA challenge before a federal district

court, not as a bid protest action in this court, and therefore, the court lacks jurisdiction

over PDS's challenge. The court disagrees. Following the government's change in its

regulations in March 2017, PDS is seeking to prevent the VA from awarding future

contracts to IFB in VISNs 2 and 7 without first performing a Rule of Two analysis. This

is a challenge to the VA's decision not to perform a Rule of Two analysis when the

contract for VISN 2 and VISN 7 expire and are up for renewal. This court's bid protest

jurisdiction is "very sweeping in scope." *RAMCOR,* 185 F.3d at 1289. In fact, the VA

has made it clear that, absent intervention from this court, it will continue to enter into

17

contracts with IFB for eyewear without performing a Rule of Two analysis in VISNs 2 and 7. Accordingly, PDS's challenge is "in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), and thus is within the court's bid protest jurisdiction. The government's motion to dismiss is denied.

**B.    The VA is Required to Conduct a Rule of Two analysis for New Contracts Regardless of when the VISN was Added to the Procurement List**

Turning to the merits of the parties' dispute the court finds the issue to be decided is correctly stated by the plaintiff. The plaintiff phrases its understanding of the issue remaining in this case as "[w]hether the VA must apply the VBA Rule of Two prior to making new contracting determinations, including contract awards, as indicated in *Kingdomware Technologies, Inc. v. United States*, 136 S. Ct. 1969 (2016), for products and services currently listed on the Procurement List for VA facilities located in [VISN] 2 and VISN 7, which were added to the Procurement List prior to January 7, 2010." Pl.'s Supp. Brief at 2. The government phrases its understanding slightly differently: "Whether the VA reasonably interpreted the [VBA] of 2006 when it identified the pre-VBA List additions of VISN 2 and VISN 7 as mandatory sources and awarded two contracts to [IFB] without applying the Rule of Two." Def.'s Supp. Brief at 2. The court finds that the government misstates the issue at hand and that the plaintiff's statement of the issue is correct. The question before the court is not whether the VA was wrong to award the initial contract to IFB, but whether, after passage of the VBA in 2006, the VA was required to perform a Rule of Two analysis before treating the AbilityOne List as a mandatory source for any new contracts. The court finds that the VBA requires the VA

to perform the Rule of Two analysis for *all* new procurements for eyewear, whether or not the product or service appears on the AbilityOne List, because the preference for veterans is the VA's first priority. If the Rule of Two analysis does not demonstrate that there are two qualified veteran-owned small businesses willing to perform the contract, the VA is then required to use the AbilityOne List as a mandatory source.

The defendants argue that the JWOD and the VBA are not directly in conflict. Further, defendants argue that the VA's solution, as expressed in its new guidelines, which gives effect to both statutes by requiring the VA to perform a Rule of Two analysis for all procurements except for products and services that were put on the AbilityOne List before 2010 should be upheld. According to the government, neither the VBA nor the JWOD express a priority for competitive awards, and therefore, the VA's construction of the two statutes should be afforded deference under the Supreme Court's decision in *Chevron*. The government argues that Congress did not "unambiguously express[] a priority for veteran-owned small businesses over mandatory sources identified on the procurement list," Def.'s MJAR 21. Therefore, the government argues, "the VA is being required to apply two statutory mandates that Congress did not prioritize expressly, this Court should defer to the VA's reasonable construction of the Veterans Benefit Act." *Id*. at 23.

The court agrees that the VBA and the JWOD are not necessarily in conflict in all instances. However, the VA can necessarily only follow one of the statutes first when a product or service appears on the AbilityOne List. In that connection, the court must decide whether the VA's decision to exclude pre-2010 AbilityOne listed items from any

19

VBA reevaluation after enactment of the VBA is lawful. The court finds that the statutory language of the VBA, as explicated by the Supreme Court in *Kingdomware*, establishes a preference for veteran-owned small businesses as the VA's first priority. As the Supreme Court stated in *Chevron*, if a statute is clear, the court must "give effect to the unambiguously expressed intent of Congress." 467 U.S. at 843. The statute is interpreted "employing traditional tools of statutory construction." *Id.* at 843 n.9. If "the statutory language is unambiguous and 'the statutory scheme is coherent and consistent . . . the inquiry ceases.'" *Kingdomware*, 136 S. Ct. at 1976 (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)).

Under the VBA, the VA must perform a Rule of Two inquiry that favors veteran-owned small businesses and service-disabled veteran-owned small businesses "in all contracting before using competitive procedures" and limit competition to veteran-owned small businesses when the Rule of Two is satisfied. *Id.* at 1977. The VBA states that, except for certain inapplicable exceptions:

> [A] contracting officer of the Department shall award contracts on the basis of competition restricted to small business concerns owned and controlled by veterans if the contracting officer has a reasonable expectation that two or more small business concerns owned and controlled by veterans will submit offers and that the award can be made at a fair and reasonable price that offers best value to the United States.

38 U.S.C. § 8127(d). The VBA also states that

> In procuring goods and services pursuant to a contracting preference under this title or any other provision of law, the Secretary shall give priority to a small business concern owned and controlled by veterans, if such business concern also meets the requirements of that contracting preference.

38 U.S.C. § 8128(a). Based on this language, the Supreme Court found in *Kingdomware* that § 8127(d) was mandatory, and therefore "before contracting with a non-veteran-owned business, the Department must first apply the Rule of Two." 136 S. Ct. at 1977. The court found that the mandatory nature of the VBA "demonstrates that § 8127(d) mandates the use of the Rule of Two in *all contracting* before using competitive procedures." *Id.* at 1977 (emphasis added).

IFB argues that under the language of the VBA the JWOD can be reasonably interpreted as taking priority because the VBA only applies to competitive procurements, and that procurements under the JWOD are not "competitive" procurements. The court finds, however, that IFB's reading of the VBA is contrary to the Supreme Court's holding in *Kingdomware*, which expressly held that the Rule of Two was "mandatory, not discretionary," and that it thus covered the non-competitive procurements authorized under the FSS. *See* 136 S. Ct. at 1976. In this connection, the Supreme Court expressly noted that the VBA contained "no exceptions for orders from the FSS system." *Id.* at 1977. Importantly, like the FFS, the VBA also does not contain an exception for obtaining goods and services under the AbilityOne program. Indeed, the court finds it significant that an earlier version of the 2006 VBA, the Veterans Benefit Act of 2003, contained an explicit exception for contracts under the JWOD which was eliminated in the final legislation. *See* Pub. L. No. 108–183 § 308, December 16, 2003, 117 Stat. 2651 ("A procurement may not be made from a source on the basis of a preference provided under subsection (a) or (b) if the procurement would otherwise be made from a different source under section 4124 or 4125 of title 18, United States Code, or the Javits–Wagner–

O'Day Act"). The fact that Congress did not include this exception in the 2006

enactment strongly indicates that Congress meant for the VBA to apply before the VA

was required to turn to the AbilityOne List under the JWOD. It is well settled, "[w]here

Congress includes language in an earlier version of a bill but deletes it prior to enactment,

it may be presumed that the [omitted text] was not intended." *Russello v. United States*,

464 U.S. 16, 23-24 (1983).

Further, because the VBA is a more specific than the JWOD statute in that it

applies only to the VA for all of its procurements, the VBA must be read to take

precedence over the JWOD. *See Arzio v. Shinseki*, 602 F.3d 1343, 1347 (Fed. Cir. 2010)

(citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)) ("A basic tenet

of statutory construction is that a specific statute takes precedence over a more general

one."). This conclusion was stated in *Angelica Textiles* as follows:

> The Veterans Benefits Act is a specific mandate to the Department...to
> grant first priority to [service-disabled veteran-owned small businesses] and
> [veteran-owned small businesses] in the awarding of contracts. On the other
> hand, the Javits-Wagner-O'Day Act is a more general procurement statute.
> Were there a conflict between the two statutes, the more specific Veterans
> Benefits Act would control.

*Angelica Textiles*, 95 Fed. Cl. at 222. This court agrees with the *Angelica Textile* court's

reading of the statutes and thus finds that the VA has a legal obligation to perform a Rule

of Two analysis under the VBA when it seeks to procure eyewear in 2017 for VISNs 2

and 7 that have not gone through such analysis- even though the items were placed on the

AbilityOne List before enactment of the VBA. The VA's position that items added to the

List prior to 2010 are forever excepted from the VBA's requirements is contrary to the

VBA statute no matter how many contracts are issued or renewed.[9]

## C.   Laches

Regardless of the merits, the government also argues that PDS's claim for relief

should be barred under the doctrine of laches with respect to PDS's challenges to

contracts for VISNs 2 and 7, on the grounds that those items were listed on the

AbilityOne List as far back as 2002.  The affirmative defense of laches "bars a claim

when a plaintiff's 'neglect or delay in bringing suit to remedy an alleged wrong, which

taken together with lapse of time and other circumstances, causes prejudice to the adverse

party.'" *Nat'l Telecommuting Inst., Inc. v. United States*, 123 Fed. Cl. 595, 602 (2015)

(quoting *Land Grantors in Henderson, Union, & Webster Counties v. United States*, 86

Fed. Cl. 35, 47 (2009)).  A party seeking to invoke laches must demonstrate two things:

first "unreasonable and unexcused delay by the claimant," and second, "prejudice to the

other party, either economic prejudice or 'defense prejudice'—impairment of the ability

to mount a defense due to circumstances such as loss of records, destruction of evidence,

or witness unavailability." *JANA, Inc. v. United States*, 936 F.2d 1265, 1269-1270 (Fed.

Cir. 1991) (citing *Cornetta v. United States*, 851 F.2d 1372, 1377–78 (Fed. Cir. 1988)).

---

[9] The court rejects the defendants' contention that giving the VBA priority effectively repeals the JWOD by implication.  The VBA is a specific priority statute that does not mandate a result but a process which may or may not result in a contract award to a veteran-owned small business.  If the Rule of Two is not satisfied, the VA remains required under the JWOD to purchase products and services that appear on the AbilityOne List.  By its terms the VBA did not repeal the JWOD.  Rather, as the VBA states, where the VBA applies the Rule of Two is satisfied, veteran-owned small businesses have the first priority.

23

Case 1:17-cv-01903-MSK-KLM   Document 40   Filed 06/07/19   USDC Colorado   Page 131 of
132
Case 1:16-cv-01063-NBF   Document 80   Filed 05/30/17   Page 24 of 25

With respect to the first element, the court finds PDS's delay in bringing this case

was not "unreasonable and unexcused" in light of the recent decision in *Kingdomware*,

which clarified the mandatory nature of the VBA and the VA's most procurement

guidance which was issued on June 16, 2016. With respect to the element of prejudice

the court finds that IFB's allegations of prejudice are not sufficient to warrant the

application of laches in this case. IFB states:

> Since the inception the 2006 VA Act was passed through the current, IFB
> has spent considerable resources building an infrastructure to service the
> VISN 2, 7 and 8 contracts and to recruit and train the workers to perform
> under those contracts. As such, IFB stands to be suffer substantial harm by
> Plaintiff's delay. IFB's financial investments and the human capital
> investments IFB's blind workers in reliance on the continuation of these
> contracts is clearly demonstrated . . .

IFB's MJAR 35-36.

As noted above, the court does not understand that PDS is challenging the existing

contracts between IFB and the VA. Rather, it is seeking only to prevent the VA from

"making new contracting determinations, including contract awards," for VISNs 2 and 7

without first applying the Rule of Two. Pl.'s Supp. Brief at 2. Thus IFB will not lose all

of its investment immediately. In addition, the court is mindful that while IFB had

expected that its contracts in VISNs 2 and 7 would be renewed as mandatory sources

under the JWOD for years to come, IFB has had more than ten years of business

following enactment of the VBA. Indeed, application of the Rule of Two analysis may or

may not result in loss of VISNs 2 and 7 work in the future. In such circumstances,

prejudice is not so great as to outweigh the VA's obligation to meet its statutory mandate

under the VBA. For these reasons, the government's laches defense is rejected.

## IV.   CONCLUSION

For the reasons stated above, IFB and the government's motions to dismiss under RCFC 12(b)(1) and motion for judgment on the administrative record are **DENIED**. PDS's cross-motion for judgment on the administrative record is **GRANTED**. The VA is ordered not to enter into any new contracts for eyewear in VISNs 2 and 7 from the AbilityOne List unless it first performs a Rule of Two analysis and determines that there are not two or more qualified veteran-owned small businesses capable of performing the contracts at a fair price.[10]

The parties shall have until **Friday, May 26, 2017** to submit a joint proposed judgment that shall include the expiration dates of all active contracts in VISNs 2 and 7 under the AbilityOne program, and shall include a timeline of the VA's plan to conduct a Rule of Two analysis for any further contracts.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

---

[10] In its supplemental briefing following the change in the VA's guidance documents, PDS requested an order granting costs and reasonable attorneys' fees based upon the government's corrective action. The court will address this issue at a later date if PDS files a motion for fees and costs in accordance with the court's rules.

25